# Staunton

### Annie E. Hopkins v. Joseph S. Gromovsky.

September 4, 1956.

Record No. 4534.

Present, All the Justices.

The opinion states the case.

*Ernest G. Garrett, Jr. (John G. May, Jr.,* on brief), for the plaintiff in error.

*Gordon P. Williams (Thomas A. Williams,* on brief), for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

This is an action brought by Joseph S. Gromovsky against Annie E. Hopkins to recover damages for personal injuries and property damages resulting from the collision of automobiles driven by the respective parties. Gromovsky, the plaintiff, recovered a verdict and judgment of $10,000, and Mrs. Hopkins, the defendant, seeks a reversal claiming that (1) the evidence is insufficient to support the verdict and judgment; (2) the verdict is excessive; (3) the court erred in the admission of certain evidence; and (4) a new trial should have been awarded on the ground of after-discovered evidence.

The collision occurred shortly after 10:00 a. m. on November 27, 1954, at the intersection of Brook road and Westbrook avenue, in the city of Richmond. Brook road runs north and south, is 64 feet wide, with a grass plot in the center separating the north- and southbound traffic lanes. The width of the grass plot is not shown in the evidence, but it appears that on each side of the plot there is sufficient width for two lanes of travel. The speed limit on Brook road is 35 miles per hour. Westbrook avenue runs east and west and while its width is not stated it appears from the photographic exhibits to be sufficient for four lanes of travel. The speed limit on this street is 25 miles per hour and vehicles operating thereon are required by a proper sign to "Yield Right of Way" to vehicles operating along Brook road.

The evidence for the plaintiff, Gromovsky, shows that as he approached the intersection he was driving a Plymouth coupe northwardly along Brook road at about 30 to 35 miles per hour. He was accompanied by his stepson, Robert Gosnell, and the latter's wife. Gromovsky testified on direct examination that when his car was three or more car lengths from the intersection he saw a car driven by Albert W. Clopton, headed east on Westbrook avenue, stop for the "Yield" sign. Gromovsky kept on his course. "All of a sudden," he said, the Hopkins car passed the standing Clopton car and "shot out in front" of the Gromovsky car. Gromovsky applied his

brakes and "cut hard to the right" in the effort to avoid a collision, but was unable to do so. After skidding 12 to 15 feet the left front of the Gromovsky car struck the right side of the Hopkins car. The force of the impact spun the Gromovsky car around, the left door flew open, and Gromovsky and his companions were thrown through the open doorway onto the pavement.

The collision occurred, as the plaintiff said, "about in the middle of the northbound lane, or as another witness said, "in the extreme left-hand lane of the northbound lane." There is evidence that just before the collision the Hopkins car, a 1954 Lincoln sedan, was proceeding at an excessive rate of speed. While Mrs. Hopkins denied this, she admitted that although she saw the Gromovsky car approaching the intersection she did not yield the right of way to it, nor did she think that she was required to do so. She said she thought that the sign required her to yield the right of way only to southbound traffic on Brook road, and seeing none, she proceeded through the intersection. Moreover, she admitted that she did not see the Gromovsky car after she had entered the intersection and did not know that that vehicle had collided with hers.

■ The defendant concedes that there is ample evidence to warrant the finding of the jury that she was guilty of negligence which was a proximate cause of the collision. But she says that the plaintiff's own testimony shows that he was guilty of contributory negligence as a matter of law which bars his recovery, in that he was not exercising ordinary care to keep a reasonable lookout for other vehicles as he approached the intersection. The argument is that although the plaintiff had an unobstructed view of the Hopkins car as it approached on his left and passed through the intersection, his own testimony on cross-examination shows that he did not see it until it was across the northbound lane of Brook road, immediately in front of him.

It is true that such an inference may be drawn from one statement of the plaintiff on cross-examination. While, as has been said, the plaintiff testified on direct examination that he saw the Hopkins car pass the standing Clopton car, when pressed on cross-examination he said that when he first saw the Hopkins car he was about three car lengths from the intersection, and as he said, "I had not seen her until she come on out entering my part, my lane." He was then asked:

"Q. You first saw her when she entered the northbound lane, is

that true? A. I seen her when she come out from behind the other car so fast she was already in my lane when I mashed on the brakes.

"Q. Which lane was she in when you first saw her? A. The middle of her car was in the southbound lane between the southbound lane and the grass plot."

It was for the jury to say from the testimony of the plaintiff as a whole when and where the Hopkins car was when he first saw it. It must be remembered that the observations of the plaintiff were necessarily made in the fleeting moments preceding the impact when estimates of distances and time are not ordinarily recorded with precision and accuracy.

The plaintiff also testified that he was familiar with the intersection and knew of the "Yield" sign which controlled traffic entering the intersection along Westbrook avenue. If he should have seen the Hopkins car before it entered the intersection, as the defendant says he did not do, he would have had the right to assume that the driver of that car would obey the sign and yield the right of way to him. Even when he saw the defendant's car crossing the southbound lane, as he says he did, he still had the right to assume that she would yield him the right of way. In short, whether under the circumstances the plaintiff was guilty of negligence in not keeping a proper lookout for the defendant's car, and whether such negligence, if any, was a proximate cause of the collision were for the jury. These issues were submitted to the jury on instructions the correctness of which is not challenged, and its finding in favor of the plaintiff is conclusive of the matter.

The next contention of the defendant is that the verdict is grossly excessive. In falling from the car the plaintiff was rendered unconscious for a few minutes and sustained what the doctors described as a severe sprain of his neck. After receiving emergency treatment at a local hospital he was discharged and not further hospitalized. His family physician prescribed that he wear a "Thomas" collar, a device which fits around the neck to support the injured muscles. According to the plaintiff, he wore this collar four or six hours a day for three months. He was also wearing it on the date of the trial. He still complained of headaches at the time of the trial although his physicians agreed that by that time all objective symptoms had disappeared. There was no evidence that the injuries were permanent. His proven damages included eight days' loss of time from work as a car inspector, amounting to $125.68; medical bills,

$70; the cost of the "Thomas" collar, $10; the cost of repairing his automobile, $300, or a total of $505.68.

The plaintiff further testified that as a side line occupation he did some horseshoeing. While he said that his injuries interfered with that secondary occupation, he did not attempt to fix the measure of such loss.

It is not necessary that we decide whether in the light of this evidence alone the verdict of the jury was excessive, for the record shows that over the objection of the defendant the trial court admitted certain evidence relating to the quantum of the plaintiff's damages which was highly prejudicial to the defendant. The admission of such evidence is one of the main assignments of error.

During the course of the trial, Dr. James T. Tucker, an orthopedic surgeon, testified that at the request of counsel for the defendant he had examined the plaintiff shortly before the trial. In the main his findings agreed with those of the physicians for the plaintiff. He found that the plaintiff had sustained "a neck strain," but that he was recovering satisfactorily under the treatment of his family physician and would not have any permanent disability.

In the cross-examination of Dr. Tucker, counsel for the plaintiff produced a photostatic copy of a page from the Journal of the American Medical Association containing an article on "Whiplash Injuries of the Neck" by Dr. John H. Schaefer of Los Angeles. Dr. Tucker stated that he was familiar with the article. Certain extracts were read from the article with which Dr. Tucker agreed. With nothing more, counsel for the plaintiff offered the article in evidence. Over the defendant's objection the court allowed the article to be introduced, stating that since Dr. Tucker had been cross-examined concerning it, that alone put it in evidence. Later in the argument before the jury, plaintiff's counsel proceeded to read the article to the jury. The defendant again objected to its use on the ground, among others, that it was hearsay. The court allowed plaintiff's counsel to continue, instructing the jury that the article "was introduced merely to test the witness, Dr. Tucker." The plaintiff's counsel then proceeded to read the main portion of the article to the jury, commenting thereon in this manner:

"Now this doctor who has written this article—and Dr. Tucker has said he was acquainted with him and that he had read this article, he knew it was in this magazine and he agreed with it—It states here— 'Who can say how much intervertebral ligamentous tearing exists?

Who can say how much hemorrhage occurs at the site of the injury and how much subsequent fibrosis and adhesions develop around nerve roots or into or between cervical muscles? Certainly such things may be expected to result in some degree of prolonged or permanent impairment. Even worse, who can say how much or how little trauma of the cervical cord is incurred?'

"Then he goes ahead and states: 'Certainly the x-ray cannot give the answers to these questions. By the same token early treatment and physiotherapy may be expected to minimize sequelae, and delayed treatment can be difficult or futile. Prolonged immobilization—necessary or unnecessary—could be expected to similarly result in prolonged or permanent difficulty not detectable by x-ray.'

"Further he states that, 'The neck being a highly mobile structure, it seems reasonable to expect that any posttraumatic fibrosis around nerve roots or into or between muscles, even though rather slight, could be expected to give more prolonged symptoms than elsewhere along the spine.' "

As is said in 20 Am. Jur., Evidence, § 968, pp. 816, 817:

"According to the great weight of authority, medical books or treatises, even though properly identified and authenticated and shown to be recognized as standard authorities on the subject to which they relate, are not admissible as evidence to prove the truth of the statements therein contained, * * *.

    \*      \*      \*      \*      \*      \*      \*

"One of the recognized reasons for excluding medical books or extracts therefrom as evidence is the lack of opportunity for adequate cross-examination of the author and the unavailability of any tests which the accuracy of the statements made in such extracts may be gauged. Since such books lack the sanction of an oath, even if based on the author's own experience and knowledge, and since they may not even be the result of the experience or knowledge of the author, but may be based on the unsworn statements of others, they, therefore, clearly infringe the hearsay rule. * * * "

See also, 32 C. J. S., Evidence, § 718, pp. 627, 628; Wigmore on Evidence, 3d Ed., Vol. 6, § 1690, p. 2.

In *Lawrence* v. *Nutter*, 4 Cir., 203 F. 2d 540, 542, 543, Judge Soper points out that while there is a conflict of authority on the subject, there is "a substantial body of authority which holds that

when a witness is testifying as an expert, it is competent to test his knowledge on cross-examination by reading to him extracts from scientific authorities, which he recognizes as standard upon the subject matter involved, and then ask him whether he agrees or disagrees with what has been read. * * * This view has met the approval of the more recent authorities." See also, Wigmore on Evidence, 3d Ed., Vol. 6, § 1700(b), p. 18; 58 Am. Jur., Witnesses, § 846, p. 476; 32 C. J. S., Evidence, § 574, pp. 428, 429; Annotation, 82 A. L. R. 440, 453, etc.

Applying that principle to the present case, we hold that it was proper for counsel for the plaintiff to test the knowledge and accuracy of Dr. Tucker, a witness for the defendant, on cross-examination by reading to him pertinent extracts from the article and asking him whether he agreed or disagreed with what had been read.

But, as is pointed out in 32 C. J. S., Evidence, § 574, p. 429, "There is a distinction between the use of medical or other scientific books for the purpose of cross-examination merely and to test the knowledge and reading and accuracy of the witness who is on the stand and the use of such books by reading them directly or indirectly to the jury on cross-examination, not for the purpose of testing the learning, reading, or accuracy of the witness, but in order to get their contents and the opinions of their authors before the jury."

In the present case cousel for the plaintiff went far beyond merely testing the knowledge and accuracy of Dr. Tucker in the permitted manner. He not only read certain extracts from the article with which Dr. Tucker agreed, but introduced in evidence the whole article which included statements about which the physician had not been examined. In his argument before the jury counsel for the plaintiff commented fully on the article. In this manner counsel got before the jury the dissertation of the author on injuries to the neck when that physician was not before the court, had not been sworn, and was not subject to cross-examination.

The effect of the introduction of this article in evidence and the reading of the extracts therefrom to the jury was to convey to the jury the impression that the plaintiff had sustained what the article described as "whiplash injuries of the neck," the seriousness of such injuries, and the shocking consequences which might be expected to flow therefrom. This, of course, was highly prejudicial to the defendant on the issue of the quantum of damages and constituted reversible error.

For this reason the judgment is reversed, the verdict set aside, and the case remanded for a new trial on the quantum of damages. Since the after-discovered evidence upon which a motion for a new trial was predicated relates to the quantum of damages and will be available at a new trial, it is not necessary that we pass upon the ruling of the trial court in denying the motion for a new trial on that ground.

*Reversed and remanded.*