## Staunton

LILLIAN B. UNGER, ADMINISTRATRIX, ETC. v. RESSIE H. RACKLEY.

September 11, 1964.

Record No. 5756.

Present, All the Justices.

*W. W. Whitlock*, for the plaintiff in error.

*Harold H. Purcell* and *R. R. Parrish*, for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

Lillian B. Unger, administratrix of the estate of John H. Unger, III, deceased, the plaintiff, filed a motion for judgment against Mrs. Ressie H. Rackley, the defendant, seeking to recover damages for the wrongful death of John H. Unger, III, in an automobile accident. Defendant denied that she was guilty of any negligence; and, on

the other hand, averred that plaintiff's decedent was guilty of contributory negligence. The jury returned a verdict in favor of the plaintiff for $15,000.00, which the trial court set aside on the ground that plaintiff's decedent was guilty of contributory negligence as a matter of law, in that he failed to keep a proper lookout and failed to keep his car under proper control, and rendered judgment in favor of Mrs. Rackley.

The trial court had previously refused to strike the evidence both at the conclusion of plaintiff's evidence and at the conclusion of all the evidence.

The plaintiff is here on a writ of error. She assigns error to the action of the trial court in setting aside the verdict of the jury, and entering judgment in favor of the defendant, to the admission and rejection of evidence, and to the refusal to grant certain instructions. The paramount and crucial question is: Did the court err in holding that plaintiff's decedent was guilty of contributory negligence as a matter of law? We are of opinion that the question must be answered in the affirmative.

There is little or no conflict in the material evidence, save as to the speed of the vehicle operated by Unger. Since the jury resolved all conflicts in favor of plaintiff, the evidence will be stated in the light most favorable to the plaintiff.

The accident occurred on May 29, 1961, at approximately 1:00 o'clock p. m., on Route 22 in Louisa county, when a Ford automobile owned and operated by John H. Unger, III, age 20, collided with a Ford pick-up truck owned and operated by Mrs. Rackley. Unger was proceeding in an easterly direction, and Mrs. Rackley, who had been proceeding on the same road in a westerly direction, was making a left turn into an intersection leading to the entrance of the grounds of the Louisa County High School.

Route 22, in the area of the accident, is 20 feet wide, with two lanes of traffic divided by white traffic lines and is hard surfaced. The weather was clear, the roadway was straight, and visibility was clear to each driver for a distance of 600 to 700 feet ahead.

Immediately prior to the accident, Mrs. Rackley was driving behind a pick-up truck operated by David Sacra, proceeding, as she was, in a westerly direction. Sacra, intending to pick up a pupil from the High School, turned to his right off the hard surface of the highway to the shoulder of the road, after giving both a right-hand signal light from his truck and a stop and slow signal with his hand. In the meantime, Mrs. Rackley began to pass Sacra's truck, and in doing

so drove her car a short distance across the center line of the highway. She said, however, that since Sacra's truck had gotten completely off the hard surface of the road as she began to pass it, she did not have to move out of her lane of travel in order to get by the truck.

Sacra said that she began turning toward the intersection when she was 10 to 15 feet from it and that he did not see her give any signal for the turn. However, Mrs. Rackley stated that she did not begin to make the turn until she got "to the center of the intersection." She was then traveling at approximately 10 miles per hour.

The entrance road to the High School where it joins the hard surface of Route 22 is 63 feet wide, narrowing to 32 feet at a point 10 feet from Route 22. When the Rackley truck had gotten approximately one-half way across the eastbound lane of Route 22, the left front of her vehicle was struck by the left front of the Unger vehicle. Defendant's truck was knocked back into the road a distance estimated from 5 to 25 feet, and the Unger vehicle was turned around and came to rest in a ditch at a distance estimated from 15 to 25 feet from the point of the collision. Unger was killed by the impact, and a companion in his car, Noland Groome, was slightly injured.

There was a considerable difference among the witnesses as to the speed of the Unger vehicle.

Mrs. Georgia P. Musser, who was sitting on her front porch across the highway from the entrance to the High School, said she saw the Unger car as it proceeded for a distance of approximately 550 feet, prior to the collision, passing in front of her home; that it was traveling at an ordinary speed, that is within 55 miles per hour, the lawful rate on that highway; that she knew the Unger automobile; had driven it; and thought she was capable of approximating the speed of an automobile.

A defense witness, Preston Farmer, said that he met the Unger vehicle approximately half a mile west of the scene of the accident; and that he thought it was being driven by Unger at a speed of 50 to 55 miles per hour.

David Sacra, said that he only got a glimpse of the Unger car as it was coming toward him and could only guess at its speed. He testified that he had previously told a State trooper that he thought the Unger car was running 70 to 75 miles an hour. He further said that after he looked behind him and saw Mrs. Rackley's car cutting out toward the center of the road, he looked forward and the Unger

vehicle was then approaching at a distance of 200 to 300 feet from the intersection.

Noland Groome, who was an occupant of the Unger car, said that he "blacked out" when he saw the Rackley truck coming across the road. He testified that when first asked about the speed of the Unger car, he told the investigating State trooper that it was traveling at 55 miles per hour when the accident occurred. It further developed that he had stated to plaintiff's counsel several months after the accident that the Unger vehicle was traveling at approximately 75 miles per hour, and he testified in court that he looked at the speedometer right before the accident and it registered 100 m. p. h.

Mrs. Ann Anthony, who was sitting on the porch with Mrs. Musser at the latter's home, estimated the speed of the Unger car as it approached the intersection at about 75 miles per hour.

Mrs. Rackley stated that she did give a hand signal before making the left turn; but admitted that she did not give the signal continuously as required by statute. She did not see the Unger car until her daughter, who occupied her car, called her attention to it. At that time, it was approximately 200 to 300 feet away from her. She further said:

"* * * I saw nothing coming, so, when I made my left turn I looked back behind me, and I had crossed the white line and my daughter said, 'Mama, there is a car coming. Coming fast.' You know a truck doesn't have a glass here and you have to bend like this to see this way. So, I bent this way, and it was down in front of that other house * * *."

Asked if she was already making the turn at that point, she said: "Yes, I had made that turn, that truck is long, so I had to look this way to see straight down the road."

Asked what is the next thing that happened, she replied:

"The next thing that happened, I saw the car and I saw through the windshield that he was in front of me, right beside the windshield, and I saw the car, then the next thing I had the sensation, I thought the car was turning over, I had a peculiar sensation of turning over, and then the next thing I was on the ground and my head was paining and I called Zula— * * *."

Asked, "Can you tell us your speed, Mrs. Rackley, as you were making that left turn?"

"A. Well, I didn't look at the speedometer but it couldn't have been over ten miles an hour, but it was in second gear and there was nothing to fear, I had the whole road, I thought."

Section 46.1-215, 1960 Rep. Vol., Code 1950, sets out "Required position and method of turning at intersections," as follows:

"The driver of a vehicle intending to turn at an intersection or other location on any highway except as prohibited by § 46.1-214 or any local ordinance enacted pursuant to § 46.1-180 or § 46.1-185 (3) shall do so as follows:

"(a) Right turn: * * *

"(b) Left turns on two-way roadways: At any intersection where traffic is permitted to move in both directions on each roadway entering the intersection, an approach for a left turn shall be made in that portion of the right half of the roadway nearest the center line thereof and by passing to the right of such center line where it enters the intersection and after entering the intersection the left turn shall be made so as to leave the intersection to the right of the center line of the roadway being entered. Whenever practicable the left turn shall be made in that portion of the intersection to the left of the center of the intersection."

Section 46.1-216, 1960 Rep. Vol., Code 1950, Cum. Supp., 1962, with reference to "Signals required on starting, backing, stopping or turning," provides:

"Every driver who intends to start, back, stop, turn or partly turn from a direct line shall first see that such movement can be made in safety and whenever the operation of any other vehicle may be affected by such movement shall give such signals as are required in §§ 46.1-217, 46.1-218 or 46.1-220, plainly visible to the driver of such other vehicle, of his intention to make such movement."

Section 46.1-217, Rep. Vol., 1960, Code 1950, with reference to "How such signals given," provides:

"(a) The signal required by § 46.1-216 shall be given by means of the hand and arm or by some mechanical or electrical device approved by the Superintendent, in the manner herein specified. Whenever the signal is given by means of the hand and arm, the driver shall indicate his intention to start, stop, turn or partly turn by extending the hand and arm from and beyond the left side of the vehicle, in the manner following:

"(1) For left turn or to pull to the left, the arm shall be extended in a horizontal position straight from and level with the shoulder;

"(2) For right turn * * *

"(b) Wherever the lawful speed is more than thirty-five miles per hour such signals shall be given continuously for a distance of

at least one hundred feet, and in all other cases at least fifty feet, before slowing down, stopping, turning, partly turning or materially altering the course of the vehicle."

Section 46.1-222 relating to vehicles turning to the left, sets out:

"The driver of a vehicle, in an intersection and turning therein to the left across the line of travel of vehicles within or approaching the intersection shall yield the right of way to such other vehicles, provided, however, that where there is an automatic signal device governing the flow of traffic at any intersection and allowing turns to the left while all other vehicular traffic is required to stop, any vehicle making such turn shall have the right of way over all other vehicles approaching the intersection."

The evidence in this case showed that Mrs. Rackley drove her truck across the center line of the two-lane highway as she began passing the Sacra truck, although there was sufficient room for her to pass it and stay on her side of the road; that she began to make a left turn before she got to the intersection; and that she made the turn without giving the signals required by statute. She did not see the Unger car before she started to make the turn, although that car was in plain view for a distance of more than 600 feet ahead. She said that she thought she had "the whole road" for her use until her attention was directed to the approaching car by her daughter. She made no effort to divert or turn the course of her vehicle when she did see the Unger car approximately 200 to 300 feet distant, and her lane, the westerly lane of travel, was free from obstruction.

A mere glance would have disclosed the Unger car. There was nothing to keep her from looking ahead, and there is every reason why she should have looked ahead. She offered no explanation for her failure to earlier observe the approaching car.

In *Von Roy* v. *Whitescarver,* 197 Va. 384, 392, 89 S. E. 2d 346, we said:

"Statutory duty, as well as ordinary prudence, requires the driver of a motor vehicle 'who intends to start, stop, turn or partly turn, from a direct line' to give not only a correct signal of his intention to make such movement when the operator of another vehicle may be affected, but also that he shall first see that such movement can be made in safety.

"A driver of a motor vehicle is under the absolute duty to see an oncoming vehicle which is in such plain view that looking with reasonable care, he is bound to have seen it. (Citing cases.)

"* * * 'But if a person having a duty to look carelessly under-

takes to cross without looking, or if looking fails to see or heed traffic that is obvious and in dangerous proximity, and continues on into its path, he is guilty of negligence as a matter of law.' " (Citing cases.)

The burden was on the defendant to prove not only that plaintiff's decedent was guilty of contributory negligence, but that his negligence was a proximate, direct, efficient and contributing cause of his injury. *Brown, Adm'r* v. *Peters, Adm'r*, 202 Va. 382, 390, 117 S. E. 2d 695.

"Contributory negligence of a plaintiff is failure to use reasonable care. Such failure is not presumed, but must be shown by the evidence. Depending as it does upon the facts of the case, it is usually a jury question, and is to be decided by the court only when reasonable men should not differ as to what facts are proved and as to the proper inferences from the facts proved." *Whitfield* v. *Dunn*, 202 Va. 472, 476, 117 S. E. 2d 710.

"If reasonable men may differ as to the conclusion of facts to be drawn from the evidence, or if the conclusion is dependent upon the weight to be given the testimony, a jury is the proper tribunal to decide the question of negligence, ordinary or gross." *Steele* v. *Crocker*, 191 Va. 873, 880, 62 S. E. 2d 850.

"Negligence only becomes a question of law to be taken from the jury when the facts are such that fair-minded men can only draw one inference therefrom. If fair-minded men, from the proofs submitted, may honestly differ as to the negligence charged, the question is not one of law but of fact to be determined by the jury under proper instructions from the court." *Stanley* v. *Tomlin*, 143 Va. 187, 192, 129 S. E. 379; *Allen* v. *Brooks*, 203 Va. 357, 361, 124 S. E. 2d 18; *Spiegelman* v. *Birch, Adm'r*, 204 Va. 96, 99, 129 S. E. 2d 119; *Commonwealth* v. *McNeely*, 204 Va. 218, 222, 129 S. E. 2d 687.

In the recent case of *Giannone* v. *Johnson, Adm'x*, 204 Va. 493, 496, 132 S. E. 2d 445, Mr. Justice Carrico said this:

"A determination, as a matter of law, that a party is guilty of, or is free from, negligence should be made only where the evidence is such that reasonable men could reach but one conclusion thereon; where fair-minded men, weighing the evidence and drawing all just inferences therefrom, would not differ in their views with relation thereto; where the evidence is without conflict and permits of one, and only one, fair result."

The evidence does not disclose when Unger saw the Rackley

truck, or where that truck was at the time he saw it, or what he did, if anything, if he did see the truck. If he saw the truck some distance from him on the wrong side of the road, he might have assumed that Mrs. Rackley would comply with the law and return to her proper side of the highway, or stop before proceeding into the intersection. *Brown* v. *Vinson, Adm'r*, 198 Va. 495, 499, 95 S. E. 2d 138.

In the absence of any evidence to the contrary, it must be presumed that Unger exercised ordinary care for his own safety, as he approached the intersection, looked out for vehicles approaching, and did only what an ordinarily prudent man would have done under the circumstances prevailing. *Stratton* v. *Bergman*, 169 Va. 249, 256, 192 S. E. 813; *Martin* v. *Carrington*, 193 Va. 627, 629, 630, 70 S. E. 2d 313.

See also *Armstrong* v. *Rose*, 170 Va. 190, 196 S. E. 613.

There was a conflict in the evidence as to the speed of the Unger car. Two witnesses testified that just prior to the accident, it was traveling at a lawful rate of speed not exceeding 55 miles per hour. Another witness, Groome, an occupant of the Unger car, first said that it was traveling at 55 miles when the collision occurred; but thereafter, at different times and different places, estimated its speed to be much greater. Other witnesses estimated the speed at more than 55 miles per hour. The jury had to determine which of the witnesses were more reliable, and they manifestly accepted the testimony of those who said that the car was proceeding at a lawful rate.

We have long followed the rule that where the evidence is in conflict, the question of contributory negligence should be left to the determination of a jury. *Ferguson* v. *Virginia Tractor Co.*, 170 Va. 486, 489, 197 S. E. 438.

In view of the conclusion which we have reached, it is not necessary to consider any of the remaining assignments of error. The judgment of the trial court is reversed; the verdict of the jury reinstated; and judgment here entered for the plaintiff in the sum of $15,000.00, with interest and costs incident to the prosecution of this action.

*Reversed and final judgment.*