## Staunton

ROSEMARY AGNES MINTER, AN INFANT, ETC. v. LINDA GAYLE
CLEMENTS, AN INFANT, ETC.

September 10, 1965.

Record No. 6011.

Present, Spratley, Buchanan, Snead, I'Anson, Carrico and Gordon, JJ.

E. *Marshall Frost* (*Caskie, Frost, Davidson & Hobbs*, on brief), for the plaintiff in error.

*Paul Whitehead*, for the defendant in error.

GORDON, J., delivered the opinion of the court.

Error is assigned to the action of the trial court in submitting this tort action to the jury on the issue of damages alone. Counsel for the defendant (plaintiff in error) admits her primary negligence, but urges that the evidence raised a jury issue of the plaintiff's contributory negligence. The sole question, then, is whether the court should have granted an instruction respecting the plaintiff's contributory negligence, and should have permitted the jury to determine the issue.

Linda Gayle Clements brought this action, by her next friend, to recover damages for personal injuries sustained in an automobile accident. The accident happened at the intersection of Yeardley and Wingfield Avenues in the city of Lynchburg during the afternoon of April 15, 1962. A Buick automobile, driven by the plaintiff east on Yeardley Avenue, collided with a station wagon, driven by Rosemary Agnes Minter (the defendant) north on Wingfield Avenue.

The trial court sustained the plaintiff's motion to strike the defendant's evidence, insofar as the evidence pertained to primary or contributory negligence, and the court instructed the jury to return a verdict for the plaintiff and to award damages on the basis of the evidence and the court's instructions. The jury returned a verdict for $25,000, upon which the court entered judgment for the plaintiff.

If an issue of contributory negligence was properly raised by the evidence, the jury was entitled to accept the evidence most favorable to the defendant. This will be borne in mind in our statement of the facts; but, in this connection, we point out that the facts, as they were adduced by the several witnesses, are not substantially controverted.

It was stipulated that (1) the avenue on which the plaintiff was driving, Yeardley Avenue, was an arterial street, (2) a "Yield Right of Way" sign faced the defendant as she drove north on Wingfield Avenue, controlling her movement into the intersection, and (3)

the applicable maximum legal speed limit was 25 miles per hour. Yeardley Avenue is approximately twenty-five feet wide and level, west of the intersection. Approaching the intersection from the south, Wingfield Avenue is approximately twenty feet wide, with a five percent upgrade.

According to the plaintiff's witnesses, she was driving on Yeardley Avenue before the accident at a speed of 20 to 25 miles per hour. Automobiles were "lined" on both sides of the avenue. One of these automobiles was parked at or near the front of the last house on the south side—that is, the corner house, whose front yard extended along the south side of Yeardley Avenue and side yard extended along the west side of Wingfield Avenue.[1] There were trees on the south side of Yeardley Avenue. One tree, which was at the intersection and was cut down after the accident, will be referred to later in connection with the surveyor's testimony.

The plaintiff and her passenger estimated that they were about fifteen or twenty feet from the intersection when they first saw the station wagon driven by the defendant. At this time, the station wagon was farther from the intersection than was the plaintiff's Buick. The plaintiff thought that the station wagon was not quite as close to the intersection as she was; and her passenger estimated that the station wagon was about two car lengths from the intersection and the Buick was about one and one-half car lengths from the intersection. The defendant's speed was estimated at 30 to 35 miles per hour.

When the plaintiff first saw the defendant, she thought that the defendant would observe the mandate of the "Yield" sign. Upon seeing that the defendant did not intend to stop or slow down, the plaintiff applied her brakes, causing skid marks (which will be referred to later). The automobiles collided in the intersection in the right hand lane of traffic for both automobiles, that is, in the proper lane of traffic proceeding east on Yeardley Avenue and in the proper lane of traffic proceeding north on Wingfield Avenue.

A city police officer came to the scene of the accident shortly after it happened. He observed skid and scuff marks made by the plain-

---

[1] Defendant's counsel does not agree that there was evidence of a parked automobile in front of this corner house. But the passenger in the plaintiff's automobile gave this uncontradicted testimony: "Q . . . There were no parked cars in front of the house there [the house at the corner] were there?" "A. About midway the first house was a tree." "Q. I am asking about cars." "A. There was a car parked about midway the tree."

tiff's automobile, and he observed the position of the two automobiles where they came to a stop after the accident.

The skid marks made by the plaintiff's Buick, which had four-wheel brakes, began at the western edge of the intersection and extended in an easterly direction twelve feet to the point of impact. The scuff marks indicated that the Buick was pushed in a northerly direction, when its right side was struck by the front of the station wagon driven by the defendant. The scuff marks were eight feet long.

From the end of the scuff marks, the plaintiff's Buick proceeded in a northeasterly direction, over the curb on the north side of Yeardley Avenue and up a bank. It stopped in the front yard of a house on the north side of Yeardley Avenue, after striking and knocking down a handrail on concrete steps leading from the sidewalk to the house. The distance between a fire hydrant, near the northeast corner of the intersection, and the place where the Buick came to a stop, according to the officer's measurement, was 118 feet.

After the impact and during the movement of the Buick to its resting place, the plaintiff was in the arms of the passenger sitting to her right. The brakes were not applied, and the passenger stated that "It felt like it [the Buick] speeded up a little bit." The plaintiff was removed to a hospital in an ambulance.

The station wagon driven by the defendant veered to the right after the impact. It stopped on Yeardley Avenue, east of the intersection, with its right front wheel at or near the south line of Yeardley Avenue.

The defendant, who also was injured in the accident, could recall only that she was driving up Wingfield Avenue and there was a crash. Her next recollection was of a statement made, while she was in the emergency room at the hospital; she testified that the passenger in the plaintiff's automobile said "I didn't see a thing. I didn't see anything." (The passenger denied making that statement.) The defendant relies, for proof of the plaintiff's contributory negligence, upon this statement made by the plaintiff's passenger, upon the testimony of the plaintiff and her witnesses, and upon the testimony of a surveyor who was called as a witness for the defendant.

In the brief for the plaintiff in error (defendant), counsel points to the plaintiff's testimony that she assumed, when she first saw the station wagon driven by the defendant, that the defendant would stop because of the "Yield" sign, and the plaintiff's further testimony, "I didn't stop but when I came closer to the intersection and saw

she wasn't going to stop I slammed on the brakes as hard as I could to see if maybe she wouldn't hit me." In oral argument before us, he emphasized this portion of the plaintiff's answer to a question asked of her while on the witness stand: ". . . I didn't see Rosemary [the defendant] until I was almost in the intersection because there was a tree and a house and I couldn't see anything and I don't know but when I did see it maybe I put on the brakes, I don't remember what happened." (The complete answer is set forth in the footnote.[2])

A certified surveyor, who inspected the scene of the accident and environs more than two years after the date of the accident, was called as a witness for the defendant. He testified that a person, who stood at the center of Yeardley Avenue 100 feet west of the intersection with Wingfield Avenue, could see an automobile proceeding north on Wingfield Avenue (the direction in which the defendant was proceeding), when the automobile was ninety feet south of the intersection of Yeardley and Wingfield Avenues; that when a person stood in Yeardley Avenue fifty feet west of the intersection, he could see an automobile proceeding north on Wingfield Avenue, when the automobile was 210 feet from the intersection. (The witness stated that his line of vision, standing in Yeardley Avenue, was approximately the same as that of a person sitting in an automobile.) The witness admitted that the visibility would be affected by an automobile parked in front of the corner house at the intersection, depending upon the height of the automobile. He admitted, moreover, that the tree at the intersection, which we have referred to, was not standing when he visited the scene of the accident.

Our first appropriate inquiry is whether the plaintiff had the right of way as a matter of law, when entering the intersection from Yeardley Avenue. Under Virginia Code of 1950, § 46.1-221, the plaintiff had the right of way because a "Yield Right of Way" sign was posted on Wingfield Avenue, unless the plaintiff was

---

[2] The plaintiff's complete answer to the question was: "Well, I will tell you what I do know, which isn't very much. I was going up Yeardley and there were cars lined on both sides. It is narrow at this end of Yeardley between Sussex and Wingfield, it is narrower than it is after you cross. It is just room for one car to go between parked cars on each side and I was just traveling up there and I knew Wingfield was a yield street and that traffic on Yeardley could go through without having to stop and I didn't see Rosemary until I was almost in the intersection because there was a tree and a house and I couldn't see anything and I don't know but when I did see it maybe I put on the brakes, I don't remember what happened."

"traveling at an unlawful speed." And the uncontradicted direct testimony is that the plaintiff was traveling at a speed of not more than 25 miles per hour, which was a lawful speed, by stipulation of counsel.

The defendant argues, however, that a jury issue respecting the plaintiff's speed was raised by an inference to be drawn from the direct testimony. The impact occurred in the southeast quadrant of the intersection. The plaintiff's Buick came to rest in a yard on the north side of Yeardley Avenue, at a point 118 feet from a hydrant near the northeast corner of the intersection, after its movement was impeded by a curb, a bank and an iron railing. The defendant's station wagon came to rest at a place on Yeardley Avenue near the intersection.

The jury would not have been justified under the facts of this case, however, in inferring from the location of the vehicles after the accident that the plaintiff had been traveling at an unlawful speed. No person controlled the movements of the plaintiff's automobile after the impact; the driver was in the arms of her passenger to the right. The brakes were not applied, and the clear inference from the testimony is that the automobile was proceeding under its own power. The scuff marks made by the plaintiff's automobile after the impact support the direct testimony that the defendant was traveling at an unlawful speed; but the position of the two vehicles after the accident does not support an inference of the plaintiff's unlawful speed. The jury should be permitted to draw an inference from the evidence only if the inference may be reasonably drawn. *Virginia Transit Co.* v. *Schain*, 205 Va. 373, 137 S.E. 2d 22.

■ To sustain the charge of contributory negligence, there must be evidence to support a finding that the plaintiff failed to comply with a duty imposed by law upon a driver who had the right of way—the plaintiff clearly had the right of way under Virginia Code of 1950, § 46.1-221. The charge made by the defendant is that the plaintiff failed to keep a proper lookout. This will be discussed; but, first, it should be mentioned that the burden of proving contributory negligence is upon the defendant (*Unger* v. *Rackley*, 205 Va. 520, 138 S.E. 2d 1)—a point to be discussed later.

The evidence supports only the findings that the plaintiff, while driving at a speed of 20 to 25 miles per hour, saw the defendant's station wagon before she (the plaintiff) entered the intersection—when the plaintiff was approximately fifteen to twenty feet from the intersection—and the plaintiff applied her brakes when she realized

that the defendant did not intend to stop or decrease her speed. Both the plaintiff and her passenger so testified. True, at one point in her testimony, the plaintiff said that she did not see the defendant until she was almost in the intersection, and "maybe I put on the brakes" (*ante*, footnote 2). But, as outlined in the next succeeding paragraph, the physical facts explain the meaning of "almost in the intersection," and they demonstrate that the plaintiff did apply her brakes.

The skid marks began at the western edge of the intersection, and some allowance should be made for the reaction time—that is, the interval of time between the plaintiff's realization that the speed of the other vehicle would not be retarded and her application of the brakes. According to the table of speed and stopping distances (Virginia Code of 1950, § 46.1-195), the average distance traveled during the reaction time is twenty-seven feet, when driving at 25 miles per hour, or twenty-two feet, when driving at 20 miles per hour. The unescapable inference, then, is that the plaintiff had seen the defendant's station wagon, and that she realized that the defendant would not slow down when she (the plaintiff) was approximately twenty-seven feet or twenty-two feet from the intersection, and that she reacted by applying her brakes. Therefore, the physical facts strengthen the conclusion that the plaintiff was keeping a proper lookout. They indicate that the plaintiff was more than twenty-two feet from the intersection, when she saw the defendant, instead of fifteen or twenty feet, as estimated by the plaintiff.

Counsel for the defendant (plaintiff in error) asserted in his brief: "No evidence was introduced to explain why she [the plaintiff] did not see the defendant's automobile sooner." But the plaintiff and her passenger stated that parked cars and trees blocked the vision. Counsel was unmindful, moreover, of the defendant's burden of proving contributory negligence (which was not shown by or reasonably inferable from the plaintiff's evidence); unmindful that it was incumbent upon the defendant to produce evidence that would justify the jury in finding that the plaintiff should have seen the defendant sooner, and that this failure efficiently contributed to cause the accident. And the defendant did not produce such evidence.

The testimony of the surveyor was not sufficient to raise the issue. His conclusions, respecting the opportunity of the plaintiff to observe the defendant traveling north on Wingfield Avenue on April 15, 1962, were drawn from a view of the scene of the accident and

environs on June 22, 1964. The evidence does not show that, on the later day, there were automobiles parked in the same places as on the day of the accident. Moreover, a tree at the intersection had been cut down. The surveyor's evidence, therefore, does not contradict the direct testimony with respect to the plaintiff's opportunity to observe the defendant's station wagon before the accident.[3]

The alleged statement of the passenger in the plaintiff's automobile, "I didn't see a thing. I didn't see anything.", was not sufficient to raise the issue of contributory negligence, for two reasons. The only probative value of the statement (if made) was to impeach the passenger's testimony. It did not tend to prove that the plaintiff did not see the defendant's station wagon before the plaintiff entered the intersection. Moreover, the evidence does not show that the passenger's statement, alleged to have been made while she was in the emergency room after the accident, had reference to the defendant's station wagon or had reference to a time before the impact.

The general propositions of law advanced by counsel for the defendant, and outlined in the two succeeding paragraphs, are not subject to question.

Contributory negligence and proximate cause are generally issues to be resolved by the jury. If reasonable men can differ about the factual conclusions and the fair inferences to be drawn from the evidence, or if a conclusion depends upon the weight to be given to the testimony, the jury should determine the issue. See *Bates, Adm'x v. Thompson*, 200 Va. 501, 106 S.E. 2d 728.

Also, "the fact that one vehicle has the right of way over another at a highway intersection does not relieve the driver of the privileged vehicle of the duty of keeping a reasonable lookout and otherwise exercising ordinary care to avoid a collision. Nor can the driver of the privileged vehicle, insisting upon the right of way, drive heedlessly into the path of another rapidly oncoming vehicle." See *Hoffman v. Stuart*, 190 Va. 880, 884-885, 59 S.E. 2d 94, 96.

Nevertheless, as stated in *Hoffman v. Stuart, supra*, "In the absence of evidence to the contrary, the presumption is that . . . [the driver who was charged with contributory negligence] was keeping a

[3] Even if we accept the surveyor's testimony as being of probative value, it tended to prove only that when the plaintiff was 100 feet and 50 feet west of the intersection, she could have seen automobiles on Wingfield Avenue that were 90 feet and 210 feet, respectively, south of the intersection. But the plaintiff, if she saw the defendant on Wingfield Avenue at a point 90 feet or 210 feet from the intersection, would have had no reason to believe that the defendant would fail to observe the mandate of the "Yield" sign before entering the intersection.

proper lookout and saw the approaching ... [vehicle]." (See 190 Va. 880, 885, 59 S.E. 2d 94, 97.) And the evidence in the case at bar does not rebut the presumption that the plaintiff was keeping a proper lookout; nor does it support a finding that the plaintiff, "insisting upon the right of way," drove "heedlessly into the path of" the defendant's automobile.

Defendant's counsel relies principally upon *Hopkins* v. *Gromovsky*, 198 Va. 389, 94 S.E. 2d 190, and *Hoffman* v. *Stuart, supra*, 190 Va. 880, 59 S.E. 2d 94, to sustain his position that the issue of contributory negligence in this case should have been submitted to the jury. Those cases, however, do not control the decision in this case.

In *Hopkins* v. *Gromovsky, supra*, involving an intersection accident, the defendant contended that testimony given by the plaintiff showed contributory negligence as a matter of law. On direct examination, the plaintiff said he saw the defendant's vehicle before it entered the intersection, and on cross-examination, his testimony was to the effect that he did not see the defendant's vehicle until it was in front of him. We held that the jury was entitled to determine, from the plaintiff's testimony as a whole, the position of the defendant's automobile when the plaintiff first saw it.

The accident in *Hoffman* v. *Stuart, supra*, happened at an inverted "T" intersection in open country. The sole issue before us was whether the right to recover was barred by contributory negligence as a matter of law. We reinstated a verdict for Hoffman's administrators, which had been set aside by the trial court, holding that their decedent (the driver of one of the vehicles involved in the accident) was not guilty of contributory negligence as a matter of law.

We find no error in the judgment appealed from. Accordingly, it is

*Affirmed.*