**Richmond**

KIMTHON EUGENE SCOTT

v.

COMMONWEALTH OF VIRGINIA

No. 1180-88-2

Decided December 26, 1990

COUNSEL

Russell C. Williams, Assistant Public Defender (Office of the Public Defender, on brief), for appellant.

Eugene Murphy, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

## ON REHEARING EN BANC

OPINION

**BENTON, J.**—This appeal by Kimthon Eugene Scott presents the question whether a jury officer's comments to venire members denied Scott the right to trial by an impartial jury. A panel of this Court previously considered Scott's appeal and, in an unpublished memorandum opinion dated May 15, 1990, affirmed the trial judge's denial of a motion to set aside the verdict. Upon Scott's petition for a rehearing *en banc*, we reverse.

Scott was tried by a jury for robbery and the use of a firearm in connection with the robbery. After the jury convicted Scott on both charges, his defense counsel discovered that during a jury orientation session a jury officer made improper comments to the prospective jurors assembled for cases pending that day. The jury that convicted Scott was selected from that same group of prospective jurors. Scott moved to set aside the verdict and requested a new trial because of the jury officer's remarks.

Prior to sentencing Scott, the trial judge heard evidence from three jurors who were called by Scott's counsel to testify concerning the jury officer's comments. The first juror testified that the officer jokingly "said there were a lot of cases tried at Marshall Courts Building. One reason cases were tried here was because a lot of people, well, felt juries were lenient." She also recalled that the officer said "that there were a lot of trials here and that is why [the prospective jurors] would probably end up staying." According to the second juror, the officer "said the courts are more lenient in Richmond than in Chesterfield and Henrico and that they laugh at Richmond." The third testified that the "[o]nly thing

that sticks in my mind, or I can remember, is that Richmond jurors were known for being lenient in their verdicts." All three jurors said that the comments did not influence their deliberations on guilt or sentencing.

The trial judge denied Scott's motion to set aside the verdict and reasoned as follows:

> I don't see a scintilla of evidence that it [the officer's statement] had had any impact upon the verdicts of the jury and having reviewed the 5 Virginia Appeals case and having heard from the Forelady and two of the jurors I don't feel that you sufficiently carried the burden that you have in regard to this motion to set aside the verdict and to grant a new trial and I deny your motion.

The right of an accused to a fair trial before an impartial jury is a fundamental precept in our jurisprudence, protected by both state and federal constitutions. *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 16 (1955); *Martin v. Commonwealth*, 221 Va. 436, 445, 271 S.E.2d 123, 129 (1980). The Constitution of Virginia provides "[t]hat in criminal prosecutions [an accused] . . . shall enjoy the right to a speedy and public trial, by an impartial jury of [the accused's] vicinage . . . ." Va. Const. art. I, § 8.

> The Sixth Amendment [to the United States Constitution] guarantees a criminal defendant the right to trial by an impartial jury. No right touches more the heart of fairness in a trial.

*Stockton v. Virginia*, 852 F.2d 740, 743 (4th Cir. 1988), *cert. denied*, 489 U.S. 1071 (1989). In Virginia, "[t]hese guarantees require jurors to be impartial not only upon the issue of guilt or innocence but also upon the question of punishment." *Patterson v. Commonwealth*, 222 Va. 653, 658, 283 S.E.2d 212, 215 (1981).

Because our juries have the dual responsibility of determining questions of guilt and punishment, "it is not only important that justice should be impartially administered, but it should also flow through channels as free from suspicion as possible." *Wright v. Commonwealth*, 73 Va. (32 Gratt.) 941, 943 (1879).

> Our jury system depends on the public's confidence in its integrity. We must zealously guard against any actions or situations which would raise the slightest suspicion that the jury in a criminal case had been influenced or tampered with so as to be favorable to either the State or the defendant. Any lesser degree of vigilance would foster suspicion and distrust and risk erosion of the public's confidence in the integrity of our jury system.

*State v. Wilson*, 314 N.C. 653, 656, 336 S.E.2d 76, 77 (1985). On the record before us, we observe, as did the court in *Stockton*, that "[t]he fact that there was . . . no threat or inducement, no invasion of the sanctity of jury room deliberations, does not still the sense that something went awry." 852 F.2d at 743.

"Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox v. United States*, 146 U.S. 140, 150 (1892). The Supreme Court reaffirmed these principles in *Remmer v. United States*, 347 U.S. 227 (1954), and also addressed allocation of the burden:

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, *but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.*

*Id.* at 229 (emphasis added).

In the present case, the trial judge expressly stated that Scott failed to meet the burden of proving harmful influence. Scott's proof established, however, that the jury orientation officer made improper remarks to persons who were assembled as prospective jurors, some of whom ultimately served on Scott's jury later that same day. The statements were not innocuous. Coming from a court official charged with orienting and assisting prospective ju-

rors, the statements were patently improper, were harmful, and posed a potential for prejudice that was not overcome on this record. They were pointed remarks made to the persons summoned to determine guilt and to impose sentence on criminal defendants. The unmistakable message sent was that defendants chose jury trials because juries were lenient and, furthermore, that the juries were considered in a bad light by courts of the surrounding jurisdictions. Both the content of the message and official nature by which the message was conveyed were constitutionally impermissible. Under these circumstances, prejudicial harm is presumed. *See Remmer*, 347 U.S. at 229. Thus, Scott's showing that the jury officer made these improper comments to the potential jurors was sufficient to shift a heavy burden upon the Commonwealth to prove that the comments were harmless. *Id.* The mere fact that three of the twelve jurors said they were not influenced in their deliberations is insufficient, standing alone and in the absence of evidence that they were the only jurors who heard the remarks, to establish harmless error.[1]

This case is distinguishable from cases concerning a juror's individual biases that may be uncovered during *voir dire*. As the Court wrote in *Stockton*, where "the danger is not one of juror impairment or predisposition, but rather the effect of an extraneous communication upon the deliberative process of the jury, the defendant's right to an impartial jury requires that the government bear the burden of establishing the nonprejudicial character of the contact." 852 F.2d at 744. Furthermore, it is immaterial whether the jury orientation officer's contact with the jurors occurred before the trial started, during trial, or during actual deliberations. *See Stockton*, 852 F.2d at 743. To decide otherwise "overlooks the fact that the official character of the bailiff — as an officer of the court as well as the State — beyond question carries great weight with a jury which he had been shepherding." *Parker v. Gladden*, 385 U.S. 363, 365 (1966). The orientation, in effect, became a court-sponsored indoctrination against leniency that was impressed upon the jurors' consciousness.

[1] We need not decide whether post-trial testimony from jurors even will be sufficient to overcome the presumption of prejudice. We note, however, that even the most conscientious juror understandably would be reluctant to admit or even to recognize the full impact of communications such as these and that the compromising effect of such communications is difficult to measure.

Despite the jurors' professions that the remarks did not influence their deliberations, courts are charged with the responsibility of assuring that the judicial system and its officers are impartial and that they will not use their offices to either overtly or subtly influence the verdict or sentence in a case. *See Spear v. Commonwealth*, 213 Va. 599, 601, 194 S.E.2d 751, 753 (1973); *Skipper v. Commonwealth*, 195 Va. 870, 877-80, 80 S.E.2d 401, 406 (1954). Although difficult to measure or ascertain, the subtle, invidious influences of these communications by an officer of the court cannot be disregarded. We are not required to accept at face value a statement by a juror that he or she did not allow an improper communication to cause him or her to violate that juror's oath and duty. *Justus v. Commonwealth*, 220 Va. 971, 977, 266 S.E.2d 87, 91 (1980); *Armistead v. Commonwealth*, 38 Va. (11 Leigh) 688, 693 (1841). Jurors cannot be expected to so readily admit that they violated their oaths of office. *Armistead*, 38 Va. (11 Leigh) at 644. It is significant that one month after the orientation each of the three jurors who testified recalled the jury officer's comments. Jurors should not be placed in a position of feeling or considering that, unless they achieve results similar to their counterparts in neighboring jurisdictions, they will be subjected to criticism or ridicule.

More significantly, however, it remains undisclosed whether the other jurors heard the remarks or were affected by them. "In any event, [Scott] was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors." *Parker*, 385 U.S. at 366. On the evidence in this record, the Commonwealth has not established that Scott enjoyed this entitlement.

> The test in a criminal case is not whether the jurors were actually prejudiced by the extraneous matter, but whether they might have been so prejudiced. If they might have been prejudiced, then the purity of the verdict is open to serious doubt and the verdict should be set aside and a new trial awarded.

*Evans-Smith v. Commonwealth*, 5 Va. App. 188, 207-08, 361 S.E.2d 436, 447 (1987)(quoting *Thompson v. Commonwealth*, 193 Va. 704, 715, 70 S.E.2d 284, 290 (1952)).

Because of the heavy burden placed on the Commonwealth to establish harmlessness in cases of improper third-party

communication, "a new trial must be granted if there remains a reasonable possibility that the jury's verdict was influenced by an improper consideration." *Haley v. Blue Ridge Transfer Co.*, 802 F.2d 1532, 1537 (4th Cir. 1986). Based on the record before this Court, the evidence is insufficient to rebut the presumption of prejudicial harm. *See id.* Accordingly, we reverse the trial judge's denial of the motion and grant Scott a new trial.

*Reversed and remanded.*

Koontz, C.J., Coleman, J., Keenan, J., and Moon, J., concurred.

Barrow, J., joined by Baker, J., and Cole, J., dissenting.

The majority places a new and insurmountable burden on the Commonwealth to prove juror impartiality. Previously, the rule applied by the majority was applicable only to communications to jurors *during* trial. In addition to unnecessarily expanding application of the rule, by doing so in this case, the majority effectively establishes an irrebuttable presumption of prejudice.

Unquestionably, the defendant has a right to trial by an impartial jury. *See* U.S. Const. amend. VI; *Stockton v. Virginia*, 852 F.2d 740, 743 (4th Cir. 1988), *cert. denied*, 489 U.S. 1071 (1989). To preserve this right, a rebuttable presumption of prejudice attaches to an impermissible communication during "the deliberative process of the jury." *Stockton*, 852 F.2d at 744.

This rule applies, however, only to communications made after the jury has been sworn. *See Remmer v. United States*, 347 U.S. 227, 229 (1954); *Stockton*, 852 F.2d at 744; *Haley v. Blue Ridge Transfer Co.*, 802 F.2d 1532, 1535 n.5 (4th Cir. 1986); Annotation, *Communication Between Court Officials or Attendants and Jurors in Criminal Trial as ground for Mistrial or Reversal — Post Parker Cases*, 35 A.L.R.4th 890, 898 (1985). Extra-judicial communications made before a jury is sworn has, until now, been treated differently. *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *Stockton*, 852 F.2d at 744; *Haley*, 802 F.2d at 1535 n.5. *Voir dire* and the court's instructions protect a defendant from jury partiality acquired before a jury is sworn. *See Smith v. Phillips*, 455 U.S. at 217. "Voir dire has long been recognized as an effective method of rooting out such bias, especially when conducted in a careful and thoroughgoing manner." *Patton v. Yount*, 467 U.S. 1025, 1038 n.13 (1984). After a jury has been sworn, on the other

hand, "long-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry." *Tanner v. United States*, 483 U.S. 107, 127 (1987). Because of these concerns, a rebuttable presumption of prejudice necessarily arises from communications made after a jury has been sworn. *See Stockton*, 852 F.2d at 744.

Before a jury is sworn, however, a venireman is presumed impartial unless actual prejudice is demonstrated during *voir dire. See Irvin v. Dowd*, 366 U.S. 717, 723 (1961). Even where, as a result of pre-trial publicity, all of the chosen jurors knew that the defendant was a convicted felon and some even knew the details of the pending charges, this presumption was not rebutted without demonstration during *voir dire* of a hostile opinion on the part of the venire. *See Murphy v. Florida*, 421 U.S. 794, 800 (1975).

The jurors' oath distinctly and rationally separates the application of these two conflicting presumptions. To blur this distinction by excepting "extraneous communication" ignores the reality that a venireman's predisposition is made up of a lifetime of "extraneous communications."

This is not to suggest that the jury's verdict was beyond reproach. However, "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. at 215 (emphasis added). The defendant had this opportunity. The trial court conducted a post-trial hearing at which three jurors testified for the defendant. Each of them testified that they heard the jury orientation officer's statements. Each, however, testified unequivocally that the statements did not affect their verdict in any way.

There was no evidence that any jurors, other than the three who testified, overheard the jury officer's remarks. The defendant did not attempt to prove that other jurors had heard the statement of the jury orientation officer. He did not call other jurors to testify, nor did he ask those that he did call whether any other jurors had been present when the statement was made. There was no evidence that the other jurors attended the same orientation as the three who testified. We cannot determine from this record whether the jury orientation officer's remarks were made during a formal presentation to all of the assembled veniremen or were made to only a few under less formal circumstances.

Since evidence supported the trial judge's finding that the defendant was not prejudiced by the officer's statement and there was no evidence that the other jurors heard it, the majority opinion effectively creates an irrebuttable presumption. There is no contention that the remarks, which did not relate to the defendant's trial or to the defendant personally, were so inflammatory that their effect could not be overcome. Similarly, there is no evidence that the comments were a product of a continuous effort to contaminate or influence juries amounting to official misconduct or that the manner of examining the three jurors at the hearing was done in a manner that tended to unduly influence their responses. Even if the burden was on the Commonwealth to prove lack of prejudice, the testimony of the three jurors was sufficient to do so.

The effect of the majority opinion, however, is to create an insurmountable burden. Here, the majority infers that the officer's remarks were made to all of the jurors on the panel while assembled together. Apparently, therefore, the Commonwealth could rebut the presumption only by calling all of the jurors to testify as to the impact of the remarks on their verdict — a procedure in conflict with the common law rule against admitting a juror's testimony regarding the motives and influences affecting jury deliberations. *Mattox v. United States*, 146 U.S. 140, 149 (1892). This rule applies to all cases except those where external influences during a jury's deliberations are alleged to have affected the verdict. *See Tanner v. United States*, 483 U.S. at 117.

Expansion of this rule will also affect defendants. The majority's opinion implicitly counsels defendants during *voir dire* to avoid inquiry concerning pre-trial communications to the jury. In the event of an adverse verdict, a defendant can now challenge pretrial communications armed with a presumption of prejudice, an advantage he would not have during *voir dire.*

The jury officer's remarks are indefensible; however, they must be judged for their effect on the jury's verdict. This effect should be measured by content of the remarks, the context in which they were made and their influence on the jury, not simply by the officer's official capacity. A hallmark of our system of criminal justice is its reliance on lay juries. We trust in jurors' deliberations, in their attention to the evidence and to the trial court's instructions. We value the finality of their decisions. We should not dis-

card a jury verdict without first concluding that it is tainted by partiality.

The trial court found that the defendant failed to prove that the jurors were partial. Evidence supported this decision, and I would affirm the judgment of conviction.