451 S.E.2d 673 (1994)
Joseph COTTON, Jr.
v.
COMMONWEALTH of Virginia.
Record No. 2475-92-2.
Court of Appeals of Virginia.
December 6, 1994.
Rehearing En Banc Granted March 9, 1995.
*674 Connie Louise Edwards, Jarratt (Connie Louise Edwards, P.C., on briefs), for appellant.
Marla Lynn Graff, Asst. Atty. Gen. (James S. Gilmore, III, Atty. Gen., on brief), for appellee.
Present: BENTON, WILLIS and ELDER, JJ.
WILLIS, Judge.
On appeal from his convictions in a jury trial of robbery and the use of a firearm in the commission of robbery, Joseph Cotton, Jr., contends that the trial court erred: (1) in receiving fingernail comparison evidence, (2) in rejecting as evidence an expert's paper, (3) in refusing to strike the expert's testimony, (4) in denying Cotton's request to introduce into evidence the expert's cautionary language concerning the use of full width fingernail cuttings for comparison, (5) in permitting a witness to testify as to the victim's statement as the assailant left the store, (6) in rejecting as evidence a plastic bag found on the store's floor after the robbery, and (7) in denying Cotton's motion for a mistrial based on the sheriff's alleged contact with the jury. Cotton also contends that the evidence was insufficient to prove he committed the robbery. We agree, in part, and disagree, in part, with Cotton's points of contention.
On March 24, 1991, a man wearing a ski mask and brandishing a sawed-off shotgun entered a Wakefield convenience store operated by Chong Johnson. He yelled "nobody move, nobody move." Barbara Neal and David Robinson were in the store as patrons. The robber laid the shotgun on the counter and reached over to open the cash register. Ms. Johnson resisted him, shutting the register drawer on his hand. He knocked her back, took money from the register, and fled with approximately $700. Ms. Neal testified that as the robber left the store, Ms. Johnson exclaimed, "I know him, that's not a real gun. I know him, that's not a real gun." Ms. Neal said that she did not know whether Ms. Johnson was trying to calm her patrons or whether she actually knew the identity of the robber.
Ms. Johnson testified that the robbery occurred just after 1:00 p.m. She identified Cotton as the robber. She testified that she recognized him because the ski mask had large open areas, which exposed much of his face, and that she had seen him before as a customer. She denied making any statement as the robber left the store. She also testified that shortly after the robber left, she found a plastic bag on the floor near the cash register and that the bag had not been there before the robbery. The forensics lab found a palm print, not Cotton's, on the bag.
Darryl Turner, who knew Cotton, had paid for gas and was leaving the store when a man entered wearing a ski mask. He heard a man say "hold it" and "give me your money." Turner ran to the rear of the store where he noticed a two-toned blue car, which he thought was a 1983 Buick Regal, with its door open. Turner had previously seen this *675 car in and around Wakefield and identified it as Cotton's. He called the police.
Detective Tommy Cheek responded to the scene. He recovered "a portion of a fingernail" from the cash register. Ms. Johnson told him that the fingernail had not been in the drawer before the robbery. Several days later, Cheek clipped Cotton's fingernails and submitted those clippings for comparison with the fingernail found in the cash drawer.
Ann Davis Jones, a forensic scientist with the Division of Forensic Science, described her training and experience regarding fingernail ridge comparison as a type of tool mark evidence.[1] She described her method of scientifically processing and examining the submitted fingernail pieces and her conclusion that the nail found in the cash register drawer matched a nail clipped from Cotton's left ring finger. Ms. Jones obtained a second sample from Cotton's left ring finger and found that this sample also matched the nail found in the cash register. Consequently, she concluded that the fingernail recovered from the cash register drawer came from Cotton's left ring finger.
On cross-examination, Cotton challenged Ms. Jones's identification because the fingernail fragment found in the cash register drawer did not represent a full nail width. Ms. Jones stated that although the optimum situation would involve comparing full length samples, a half fingernail can be correctly identified.
Cotton testified that he and Corey White purchased gas at Johnson's store about 11:45 a.m. and then went to White's girlfriend's house. Finding no one at home, they drove to Alice Norman's house. He denied committing the robbery. Corey White's testimony supported this account. Alice Norman testified that Cotton arrived at her house around 12:00 or 12:30 p.m. She left with White in Cotton's car. When she returned, Cotton was still at her house and did not leave until 1:00 or 1:30 p.m. Another witness, Mary Alice Norman Parker, testified that Cotton came to the house about 12:00 and stayed until 1:30 p.m.
After the jury returned its verdicts, Cotton moved for a mistrial, alleging misconduct by the sheriff. He complained that the sheriff had entered the jury room on several occasions, for several minutes on each occasion, and had polled the jury. The trial court conducted a hearing on this assertion.
The sheriff testified that he had entered the jury room on four occasions. The first time, he carried exhibits into the room and told the jury that if they had any questions they should knock on the door for assistance. This encounter lasted thirty seconds. The second time, the jury knocked and said they had a question. The sheriff had them write the question on a piece of paper, which he took to the judge. This encounter lasted three to four minutes. The third time, the sheriff returned to the jury room and read the judge's written answer to the jury's question.[2] This encounter lasted three to four minutes. The final time, he responded to a knock on the door. The jury informed him that they had reached a verdict. He checked the verdict form and asked the jury if this was their verdict. He denied polling the jurors individually. This encounter lasted a minute. The sheriff testified that he was never present during the jury's deliberations and denied that he told them to do anything. The trial court ruled that the sheriff had acted properly and denied Cotton's motion for a mistrial.

FINGERNAIL COMPARISON EVIDENCE
Cotton first contends that the trial court erred in receiving fingernail comparison evidence as a reliable means of personal identification. He urges that we employ the criteria of Frye v. United States, 293 F. 1013 (D.C.Cir.1923). The Supreme Court of Virginia has expressly declined to adopt the Frye test. Spencer v. Commonwealth, 240 Va. 78, 97, 393 S.E.2d 609, 621, cert. denied, 498 U.S. 908, 111 S.Ct. 281, 112 L.Ed.2d 235 *676 (1990). See also O'Dell v. Commonwealth, 234 Va. 672, 696, 364 S.E.2d 491, 504, cert. denied, 488 U.S. 871, 109 S.Ct. 186, 102 L.Ed.2d 154 (1988). The Supreme Court has set forth explicitly the standard for determining the competence of scientific evidence.
When scientific evidence is offered, the court must make a threshold finding of fact with respect to the reliability of the scientific method offered, unless it is of a kind so familiar and accepted as to require no foundation to establish the fundamental reliability of the system, such as fingerprint analysis; or unless it is so unreliable that the considerations requiring its exclusion have ripened into rules of law, such as "lie-detector" tests; or unless its admission is regulated by statute, such as blood-alcohol test results.
In making the threshold finding of fact, the court must usually rely on expert testimony. If there is a conflict, and the trial court's finding is supported by credible evidence, it will not be disturbed on appeal. Even where the issue of scientific reliability is disputed, if the court determines that there is sufficient foundation to warrant admission of the evidence, the court may, in its discretion, admit the evidence with appropriate instructions to the jury to consider the disputed reliability of the evidence in determining its credibility and weight.
Spencer at 97-98, 393 S.E.2d at 621 (citations omitted).
Ms. Jones presented an extensive curriculum vitae, setting forth her academic and professional qualifications, her work experience, and her professional associations. She described in detail the scientific method employed to identify and compare fingernail ridge markings. She described studies that have been conducted confirming the uniformity and continuity of the ridge markings of each individual fingernail and confirming that those markings are unique. She gave her own expert opinion, and recited the opinions of other experts, that through the employment of this method and analysis, a fingernail paring can be uniquely and specifically identified with the nail from which it came or with other parings from that nail, and can be distinguished from other nails. Ms. Jones was challenged on cross-examination as to the integrity of the method that she had described, her bias in defending a method that she had helped develop, and suggested inconsistencies between her testimony and an article that she had written on the subject. She withstood that cross-examination and adhered to her professional view. We find no error in the trial court's acceptance of fingernail ridge comparison as a valid scientific means of personal identification and its receipt of evidence describing the comparison Ms. Jones made of the fingernail fragment found in the cash drawer and the fingernail parings taken from Cotton.

THE SUFFICIENCY OF THE FINGERNAIL COMPARISON
Cotton next contends that the trial court erred in permitting Ms. Jones to describe the comparison that she made between the nail fragment found in the cash register drawer and the nail clippings taken from him. He argues that in a published article, Ms. Jones asserted the importance of having full width nail parings for comparison. He notes that the fragment found in the cash register drawer was but a partial nail width. Thus, he argues, the fragment was insufficient to satisfy Ms. Jones's own standards for the employment of her method.
Cotton advanced this argument on cross-examination of Ms. Jones. She testified that while full width parings were preferable, a valid comparison could be made using a partial width paring, and that the paring found in the cash register drawer was sufficient to permit a dependable comparison. Employing the criteria set forth in the previous topic of this opinion, we find no error in the trial court's rejection of Cotton's argument and its receipt of the evidence.

SHOULD THE EXPERT'S TESTIMONY HAVE BEEN STRUCK
Cotton next contends that the trial court should have struck Ms. Jones's testimony because it was tied to an analysis using but a partial nail. We have already answered that argument. We find no error in the trial court's denial of this motion.

*677 PRESENTATION OF THE EXPERT'S PAPER TO THE JURY

Cotton sought to introduce into evidence a professional paper written by Ms. Jones. The paper contained the following statement: "[b]ecause of extremely close similarities noted during this study, this researcher advises that full width clippings be compared with questioned specimens, particularly when identical twins may be involved." Cotton sought to cross-examine Ms. Jones about this statement, asserting that it impeached her assertion that she was able to conduct a reliable comparison with the partial width nail fragment found in the cash register drawer. Cotton's counsel read the statement to Ms. Jones. She acknowledged that she had made the statement in her paper and reaffirmed her opinion that the statement was correct. However, she explained that the statement referred to "optimum" circumstances of comparison and did not set forth a standard of minimum necessity. The trial court ruled that the statement in the paper was posed for impeachment purposes as a prior inconsistent statement, that Ms. Jones acknowledged the statement, and that no further proof of the statement was required or appropriate. The challenge to Ms. Jones's credibility was before the jury. We find no error in this ruling.

CHONG JOHNSON'S STATEMENT
Cotton next contends that the trial court erred in permitting Ms. Neal to testify that, as the robber left the store, Chong Johnson stated, "I know him, that's not a real gun. I know him, that's not a real gun." We agree. The statement was hearsay.
"Hearsay is a statement, other than one made by the declarant while testifying at trial, which is offered to prove the truth of the matter asserted." Clark v. Commonwealth, 14 Va.App. 1068, 1070, 421 S.E.2d 28, 30 (1992). The Commonwealth offered the statement at trial to prove that Ms. Johnson knew Cotton. Thus, the statement clearly falls within the definition of hearsay.
The Commonwealth argues that Ms. Johnson's statement falls within the excited utterance exception to the hearsay rule. However, the statement reflects reasoned thought. It was not made on impulse. Because the statement lacked spontaneity, it does not fall within the excited utterance exception to the hearsay rule. Royal v. Commonwealth, 12 Va.App. 928, 931, 407 S.E.2d 346, 348 (1991).
Ms. Johnson's erroneously admitted statement prejudiced Cotton. The identity of the robber was the central issue throughout the trial. Bolstering Ms. Johnson's trial testimony that she recognized Cotton, the statement goes to the heart of that issue. We cannot say the jury verdict would have remained unchanged had the statement not been received into evidence. The erroneous admission of the statement requires reversal.

THE PLASTIC BAG
Cotton next contends that the trial court erred in refusing to admit into evidence the plastic bag found on the floor after the robbery. We agree. The admission of evidence lies within the sound discretion of the trial court, and we will not disturb its decision absent an abuse of discretion. Logan v. Fairfax County Dep't of Human Dev., 13 Va.App. 123, 409 S.E.2d 460 (1991). However, the plastic bag was an important item of evidence which Cotton was entitled to have considered.
The central issue in this case was the robber's identity. Had the plastic bag borne Cotton's fingerprint or palm print, its probative value in the case could not be disputed. Ms. Johnson does not use plastic bags in her store. The bag was not present before the robbery. The bag was found where the robber was standing during the robbery. Could the bag have been linked to Cotton, that circumstance would have tended to place Cotton on the scene at the time of the robbery.
Just as the bag could have tended to implicate Cotton had it born his palm print, so it tended to identify as the robber the person whose palm print it bore. Inasmuch as the print was not Cotton's, the bag tended to implicate another and to exonerate Cotton. The trial court erred in rejecting this evidence.

*678 THE SHERIFF'S CONDUCT

The right of an accused to a fair trial before an impartial jury is a fundamental precept in our jurisprudence, protected by both state and federal constitutions.
Scott v. Commonwealth, 11 Va.App. 516, 519, 399 S.E.2d 648, 650 (1990) (en banc).
Because our juries have the dual responsibility of determining questions of guilt and punishment, "it is not only important that justice should be impartially administered, but it should also flow through channels as free from suspicion as possible."
Id. (citation omitted).
"Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear."
Id. at 520, 399 S.E.2d at 650 (citation omitted).
Because of the heavy burden placed on the Commonwealth to establish harmlessness in cases of improper third-party communication, "a new trial must be granted if there remains a reasonable possibility that the jury's verdict was influenced by an improper consideration."
Id. at 522-23, 399 S.E.2d at 652 (citation omitted).
When a jury has been committed to the jury room to consider its verdict, outside contact must be held to a minimum. Inevitably, there will be some contact between the jury and the officer in charge. However, this contact should be limited to installing the jury in its room, seeing to its necessary comfort, and conducting the jury to and from the courtroom. The officer should avoid entering the jury room.
We find no impropriety in the sheriff's initial installation of the jury in its room.
We find inadvisable the method employed to address the jury's question, whereby the sheriff obtained the jury's written question, took it to the judge, and returned and read to the jury the judge's written reply. However, inasmuch as the parties agreed to this procedure, we do not make it ground for reversal. See Rule 5A:18.
When the jury announced that it had reached a verdict, the sheriff should have so informed the judge, and upon the judge's instruction, should have returned the jury to the courtroom. The trial judge, not the sheriff, must ascertain the existence and the propriety of the verdict.
The trial court made careful inquiry as to the sheriff's encounters with the jury and determined that no improper influence had been exerted. We accept that finding of fact. However, we observe that such conduct reflects badly on the judicial system and should not be permitted.

THE SUFFICIENCY OF THE EVIDENCE
Finally, Cotton contends that the evidence was insufficient to support his convictions. We disagree. Although the evidence was in dispute, the testimony of the victim and the other eyewitnesses, describing the robbery and identifying Cotton, together with the circumstantial evidence of the fingernail and the blue car, sufficiently support the verdicts.
The judgment of the trial court is reversed and this case is remanded for retrial consistent with the views herein expressed, if the Commonwealth be so advised.
Reversed and remanded.
BENTON, Judge, concurring in part, dissenting in part, and concurring in the judgment reversing the convictions and remanding for a new trial.
I concur in the portions of the opinion styled "The Plastic Bag." Accordingly, I would reverse the convictions. I would also reverse the convictions for the conduct described in the portion of the opinion styled "The Sheriff's Conduct." I do not join in the portions of the opinion styled "Fingernail Comparison Evidence," "The Sufficiency of the Fingernail Comparison," "Should the Expert's Testimony Have Been Struck," and "Presentation of the Expert's Paper To The Jury." For the reasons that follow, I would reverse the trial judge's decision on all the issues relating to the expert witness.
*679 In contesting the admissibility of the "scientific" evidence, Cotton did not urge in the trial court or in this Court that the Frye test be employed. Citing Spencer v. Commonwealth, 238 Va. 275, 290, 384 S.E.2d 775, 783 (1989), cert. denied, 493 U.S. 1036, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990), and O'Dell v. Commonwealth, 234 Va. 672, 695-96, 364 S.E.2d 491, 504, cert. denied, 488 U.S. 871, 109 S.Ct. 186, 102 L.Ed.2d 154 (1988), Cotton acknowledged that the Supreme Court of Virginia rejected the Frye test. He argued instead that the Commonwealth failed to establish either that the evidence met the standard of being "a reliable scientific technique" or that "the tests performed ... were properly conducted," both of which are required by Spencer. See 238 Va. at 290, 384 S.E.2d at 783. I agree with Cotton's analysis.
Upon nothing more than a self-described expert's testimony that her proposed testimony was scientifically valid and reliable, the trial judge accepted her thesis that (1) each human being's fingernails possess characteristics unique to that human being, and (2) the technique for measuring that uniqueness was reliable. The record in this case failed to establish either of those theses.
The purported fingernail comparison expert, Ann Davis Jones, is employed by the Commonwealth of Virginia's Division of Forensic Science as a forensic scientist in the field of firearms and tool mark identification. Her curriculum vitae indicates she was first employed in the forensic laboratory in 1984 as an analytical chemist to perform drug analyses. Jones testified that her current expertise was in the field of tool marks. She did not perform fingerprint identifications as a part of her job in the forensic laboratory. She also admitted that "[t]here are studies of bite marks and things like that, but I don't examine those." In addition, Jones testified that this case was the first in which she testified concerning fingernail comparisons.
Jones has never taken any classes in which she studied fingernail identifications. She also testified that she has never prepared a paper for publication on the subject matter. Nothing on her vitae indicates formal study, training, or professional experience in the area of fingernail identification.
Jones's curriculum vitae indicates that she participated in a Fingernail Striae Symposium at the 22nd Annual AFTE Training Seminar and presented a talk based on a paper she prepared titled "The Evidentiary Value of Fingernail Ridge Patterns as a Means of Personal Identification." The record indicates that Jones prepared the paper in 1990 during "independent study/research" at Virginia Commonwealth University. The paper contains three pages of text and consists of the following: (1) six paragraphs of introduction that generally discuss research done by other people and the problems encountered in getting courts to accept the technique; (2) two paragraphs titled "Materials and Methods" that describe her comparisons of fingernail clippings from five individuals; (3) two paragraphs titled "Results and Discussion" in which she describes the examinations and conclusions; and (4) a one paragraph summary in which she concludes that the ridge patterns on the five individuals "have been found to be unique." Also attached to the paper are a list of eighteen references and an appendix summarizing studies and court decisions.
Jones testified that she did personal research involving seven pairs of identical twins who were "part of the Medical College of Virginia identical twins study." She further testified that she "found no matches on any of the fingernails on any of the sets of identical twins." She also said that she studied the fingernail of a colleague who broke a fingernail and discovered that she could match the striation patterns from the broken nail to the new fingernail that grew.
She testified that she "probably ... studied approximately thirty individuals" since 1984. She further testified that she was "not aware of any studies [involving] more than thirty-seven people." She said that there have been "twenty-three to twenty-five" written studies on cases and that the reference page to her paper includes a list of publications of almost all the studies that have been done. She also testified that toenail comparisons were first admitted as evidence in court in 1955 in a fraud case in Nigeria.
Jones testified that other persons had studied dermal ridges under fingernails and concluded that the "ridges on the upper surface *680 of the nail bed are ... unique." She also testified that she was aware that experts have testified that insufficient work was done in the field to establish that fingernails are unique. Furthermore, Jones testified that she was aware of the practice in fingerprint identification of requiring a certain number of points of identification in order to make a positive identification. Her methodology in fingernail identification, however, can be established on only one point of identification. She gave no indication that her methodology has minimum standards of certainty.
Notwithstanding Jones's testimony that her professional qualifications were in the field of firearms and tool mark identification, she was offered as an expert in the field of the physiology of fingernail comparisons. It is well established in Virginia, however, that a witness who is an expert in one field is not ipso facto an expert in another field. VEPCO v. Lado, 220 Va. 997, 1005, 266 S.E.2d 431, 436 (1980). That principle applies to bar the witness's testimony "even though that [other] field is closely related" to the witness's area of expertise. Tazewell Oil Co. v. United Va. Bank, 243 Va. 94, 110, 413 S.E.2d 611, 620 (1992). Furthermore, it is equally well established that "the expressed belief of a witness that [s]he is an expert does not ipso facto require [her] qualification." Noll v. Rahal, 219 Va. 795, 800, 250 S.E.2d 741, 744 (1979). Jones's expertise was based solely upon her reading of other researchers' works and her personal comparison of the fingernails from five individuals. Her interest and enthusiasm in the subject, more akin to the kind of interest and enthusiasm one might have in a hobby, does not turn that passion into "a reliable scientific technique" merely because she said the technique is reliable.
The fields of forensic odontology and "tool marks" have a scientifically recognized basis for identification. See Commonwealth v. Graves, 310 Pa.Super. 184, 456 A.2d 561, 566-67 (1983). The question whether given a certain fingernail, its owner can be identified to the exclusion of all other people, however, is a matter not encompassed within those disciplines. Id. 456 A.2d at 567-68. "Tool marks" has long been recognized as a reliable scientific basis for making comparisons of the wound impression that a fingernail leaves in another object. Id. at 566. That kind of identification analysis must be distinguished, however, from "an attempt to identify an individual based on some of his personal characteristics." Id. at 567.
Although the court in People v. Wesley, 103 Mich.App. 240, 303 N.W.2d 194 (1981), aff'd, 421 Mich. 375, 365 N.W.2d 692 (1984), applied the Frye test to rule that fingernail comparison testimony was inadmissible, the opinion is germane to this case because the Court addressed generally the scientific validity of fingernail comparisons. Significantly, the court likened the reliability of such evidence to that of polygraphs and held that the analysis did not provide sufficient evidence of reliability of the technique. Id. 303 N.W.2d at 196. Virginia courts also have held that not all fields considered scientific are deemed to be based upon reliable scientific technique. See Lee v. Commonwealth, 200 Va. 233, 237, 105 S.E.2d 152, 155 (1958) (polygraphs, which are called "lie detector tests," are not scientifically reliable); Hall v. Commonwealth, 12 Va.App. 198, 208-10, 403 S.E.2d 362, 368-69 (1991) (hypnotically refreshed testimony is not the result of a reliable scientific technique).
In State v. Shaw, 124 Wis.2d 363, 369 N.W.2d 772 (Ct.App.), appeal denied, 125 Wis.2d 582, 375 N.W.2d 214 (1985), the Wisconsin court rejected the Frye test and admitted testimony concerning "the theory that human fingernails possess distinct and unique longitudinal striations." Id. 369 N.W.2d at 773. In so doing, however, the court held that Wisconsin law "imposes no threshold of reliability other than that implicit in a determination of relevancy and qualification of the expert." Id. at 774. The standard used in Shaw is significantly less exacting than the standard articulated in Spencer.
In a recent case, the United States Supreme Court ruled "that the Frye test was superseded by the adoption of the Federal Rules of Evidence." Daubert v. Merrell Dow Pharmaceuticals, ___ U.S. ___, ___, 113 S.Ct. 2786, 2793, 125 L.Ed.2d 469 (1993) (footnote omitted). In discussing factors to be considered in determining scientific reliability, a threshold finding that must be made under the Rules, the Court made the following observations:

*681 Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." Green, [Expert Witnesses and Sufficiency of Evidence in Toxic Substance Litigation: The Legacy of Agent Orange and Bendectin Litigation, 86 N.W.U.L.Rev. 643] at 645 [1992]. See also C. Hempel, Philosophy of Natural Science 49 (1966) ("[T]he statements constituting a scientific explanation must be capable of empirical test"); K. Popper, Conjectures and Refutations: The Growth of Scientific Knowledge 37 (5th ed. 1989) ("[T]he criterion of the scientific status of a theory is its falsifiability, or refutability, or testability").
Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication. Publication (which is but one element of peer review) is not a sine qua non of admissibility; it does not necessarily correlate with reliability, see S. Jasanoff, The Fifth Branch: Science Advisors as Policymakers 61-76 (1990), and in some instances well-grounded but innovative theories will not have been published, see Horrobin, The Philosophical Basis of Peer Review and the Suppression of Innovation, 263 J.Am.Med.Assn. 1438 (1990). Some propositions, moreover, are too particular, too new, or of too limited interest to be published. But submission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantive flaws in methodology will be detected. See J. Ziman, Reliable Knowledge: An Exploration of the Grounds for Belief in Science 130-133 (1978); Relman and Angell, How Good is Peer Review?, 321 New Eng.J.Med. 827 (1989). The fact of publication (or lack thereof) in a peer-reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.
Additionally, in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error, see, e.g., United States v. Smith, 869 F.2d 348, 353-354 (CA7 1989) (surveying studies of the error rate of spectrographic voice identification technique), and the existence and maintenance of standards controlling the technique's operation. See United States v. Williams, 583 F.2d 1194, 1198 (CA2 1978) (noting professional organization's standard governing spectrographic analysis), cert. denied, 439 U.S. 1117 [99 S.Ct. 1025, 59 L.Ed.2d 77] (1979).
Finally, "general acceptance" can yet have a bearing on the inquiry. A "reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community." United States v. Downing, 753 F.2d [1224] at 1238 [3rd Cir.1985]. See also, 3 Weinstein & Berger ¶ 702[03], pp. 702-41 to 702-42. Widespread acceptance can be an important factor in ruling particular evidence admissible, and "a known technique that has been able to attract only minimal support within the community," Downing, supra, at 1238, may properly be viewed with skepticism.
Id. at ___ _ ___, 113 S.Ct. at 2796-97.
Although consideration of these factors is not expressly required by any ruling from the Supreme Court of Virginia, these factors manifest a concern not limited to federal jurisprudence, that the principles and methodology which underlie a proffered technique be based upon "a reliable scientific technique," the test espoused by Spencer. 238 Va. at 289, 384 S.E.2d at 782. Furthermore, these factors are relevant in Virginia because our Supreme Court requires an inquiry into the question of reliability.
When scientific evidence is offered, the court must make a threshold finding of fact with respect to the reliability of the scientific method offered, unless it is of a kind so familiar and accepted as to require no foundation to establish the fundamental reliability of the system, such as fingerprint analysis, or unless it is so unreliable that the considerations requiring its exclusion have ripened into rules of law, such as "lie-detector" tests, or unless its admission is regulated by statute, such as blood-alcohol test results.
*682 Spencer v. Commonwealth, 240 Va. 78, 97, 393 S.E.2d 609, 621, cert. denied, 498 U.S. 908, 111 S.Ct. 281, 112 L.Ed.2d 235 (1990) (citations omitted).
The record in this case reflects no inquiry or findings which satisfy that concern. Based upon the evidence in this record, I would hold that the trial judge erred in admitting Jones's testimony as expert opinion evidence. Jones's testimony simply failed to meet the two-prong test articulated in Spencer. Thus, I would hold that the trial judge erred in allowing Jones to testify that the fingernail found in the cash register after the robbery was from Cotton's finger "to the exclusion of all the other people in the world." Her further testimony that there was no minimum number of points of comparison that must be made to establish identity of fingernails simply lacks support.
The Commonwealth also failed to establish that Jones's fingernail ridge identification "tests ... were properly conducted." Spencer, 238 Va. at 290, 384 S.E.2d at 783. Indeed, when defense counsel sought to explore that issue, the trial judge erroneously limited defense counsel's cross-examination of Jones.
At trial, the Commonwealth proved on its direct examination that Jones had appeared at two meetings where she "gave a talk" concerning fingernail identifications. Defense counsel sought to examine Jones using the paper that Jones had prepared and used as the basis for the "talk" she gave at the two meetings. That inquiry was relevant because the paper contained a caution concerning the comparison samples to be used. Defense counsel did not offer the paper as evidence. The trial judge refused to allow defense counsel to examine Jones concerning the variance between the technique she employed in this case and the testing method described in her own writings. That ruling was error. See Griffett v. Ryan, 247 Va. 465, 443 S.E.2d 149, 154 (1994); Hopkins v. Gromovsky, 198 Va. 389, 395, 94 S.E.2d 190, 194 (1956). The scope of the cross-examination was relevant to issues raised on direct examination and sought to expose errors in the conduct of the test.
For these additional reasons, I would also hold that the trial judge erred on the issues concerning the expert witness. The record fails to establish that Jones was qualified to testify as an expert on the uniqueness of human fingernails.

UPON A PETITION FOR REHEARING EN BANC BEFORE THE FULL COURT
On December 20, 1994, came the appellee, by counsel, and filed a petition praying that the Court set aside in part the judgment rendered herein on December 6, 1994, and grant a rehearing en banc thereof.
On consideration whereof, the petition for rehearing en banc is granted, the mandate entered herein on December 6, 1994, is stayed pending the decision of the Court en banc, and the appeal is reinstated on the docket of this Court.
The parties shall file briefs in compliance with Rule 5A:35. It is further ordered that the appellee shall file with the clerk of this Court ten additional copies of the appendix previously filed in this case.
NOTES
[1] She testified that approximately twenty-five studies, conducted over the past two decades, have concluded that fingernails are a valid means of personal identification.
[2] The judge wrote the answer and the sheriff delivered and read the note to the jury with the concurrence of the parties.