COURT OF APPEALS OF VIRGINIA


Present: Chief Judge Fitzpatrick, Judge Elder and
        Senior Judge Hodges
Argued at Salem, Virginia


CHARLES DOUGLAS RINER
                                            OPINION BY
v.   Record No. 2260-01-3        JUDGE LARRY G. ELDER
                                             MAY 6, 2003
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF WISE COUNTY
                    J. Robert Stump, Judge

        Roger D. Groot (Thomas R. Scott, Jr.; School
        of Law, Washington & Lee University; Street
        Law Firm, on briefs), for appellant.

        Donald E. Jeffrey, III, Assistant Attorney
        General (Jerry W. Kilgore, Attorney General;
        Paul C. Galanides, Assistant Attorney
        General, on brief), for appellee.


     Charles Douglas Riner (appellant) appeals from his jury

trial convictions for first degree murder, arson, and petit

larceny. On appeal, he contends the trial court erroneously (1)

denied a motion to change venue; (2) denied his motion for

mistrial based on juror misconduct that resulted in dismissal of

that juror; (3) allowed a private prosecutor with claimed

conflicts of interest to participate in the trial; and (4)

admitted the business records of a pawn shop as an exception to

the hearsay rule without proof that the entrant was unavailable.

To the extent these issues were preserved in the trial court and

properly presented on appeal, we hold the trial court's rulings were not error.  Thus, we affirm.

## I.

### BACKGROUND

Appellant was charged with the instant offenses following the death of his wife (the victim) on August 12, 1998, in a fire in the house they shared with their three children.  Appellant and the children escaped the fire without serious injury.

After the fire, members of the victim's family attempted to remove appellant as the administrator of the victim's estate and to obtain visitation with or custody of the children.  When appellant failed to appear for estate proceedings on August 11, 1999, the court removed him as administrator of the estate and issued a capias for his appearance.

In November 1999, while the capias was still outstanding, appellant falsely told school officials he was taking the children to Pennsylvania to attend a funeral but eventually went with the children to Panama.  While appellant was in Panama, a Wise County grand jury indicted him for arson and murder.  He was arrested in Panama and returned to Virginia.  The original indictment for arson and murder was later superseded by an indictment for arson, robbery and capital murder.

MOTION FOR CHANGE OF VENUE

Prior to trial, appellant moved for a change in venue, alleging that "exhaustive media coverage" within the previous year, including extensive "misinformation" about appellant and the case, left him "unable to receive a fair and impartial trial" in that jurisdiction. That information included but was not limited to the fact that appellant left the country with his children and traveled to Panama, which the media implied was flight to avoid prosecution. The trial court denied the motion.

After appellant was tried and convicted, he noted an appeal and timely filed a petition for appeal which did not include a challenge to the trial court's denial of his venue motion. Before this Court had acted on appellant's original petition, he filed a motion to enlarge the petition to include such a challenge. This Court granted appellant's motion to enlarge his petition and ultimately granted appellant's petition for appeal as to that assignment of error as well as the others addressed in this opinion.

A.

JURISDICTION AND PRESERVATION FOR APPEAL

1.  Petition for Appeal

"[A] petition for appeal must be filed . . . not more than 40 days after the filing of the record with the Court of Appeals. An extension of 30 days may be granted on motion in

the discretion of the Court of Appeals in order to attain the ends of justice." Rule 5A:12(a). Rule 5A:3 provides that "[t]he times prescribed for filing the notice of appeal (Rule 5A:6 and 5A:11) [and] a petition for appeal (Rule 5A:12) . . . are mandatory." We have expressly held that the "forty-day time limit in Rule 5A:12(a) for filing a petition for appeal is a jurisdictional requirement" and that a petition not filed within this time must be dismissed unless a motion for an extension of time is "filed[] and granted[] before the original deadline has passed." Long v. Commonwealth, 7 Va. App. 503, 505-06, 375 S.E.2d 368, 369 (1988) (en banc); see Haywood v. Commonwealth, 15 Va. App. 297, 298, 423 S.E.2d 202, 203 (1992) (en banc). Thus, in order for this Court to acquire jurisdiction over a criminal appeal, the petitioner must file a timely petition.

Here, appellant timely filed a petition containing three of the four assignments of error presently before us on appeal. Thus, this Court acquired jurisdiction to consider those three assignments of error, and the Commonwealth received notice that appellant intended to challenge his conviction.

The Commonwealth nevertheless contends this Court had no authority to allow appellant to enlarge his petition for appeal and, thus, that we lack jurisdiction to consider appellant's challenge to the denial of the motion for a change of venue. The Commonwealth relies on both the established principle that the timely filing of a petition for appeal is jurisdictional and

- 4 -

the provisions of Rule 5A:12(c), which state that "[t]he petition for appeal shall contain the questions presented" and that "[o]nly questions presented in the petition for appeal will be noticed by the Court of Appeals."  The Commonwealth cites case law providing that, "[w]hen the word 'shall' appears in a statute it is generally used in an imperative or mandatory sense."  Schmidt v. City of Richmond, 206 Va. 211, 218, 142 S.E.2d 573, 578 (1965).

We reject the Commonwealth's argument.  Although the timely filing of a petition for appeal is jurisdictional, nothing in the Rules of Court prevents us from exercising our inherent authority to allow the petitioner to present additional issues for our consideration when we have already acquired jurisdiction and have not yet acted on the original petition.  See Yarbrough v. Commonwealth, 258 Va. 347, 361, 519 S.E.2d 602, 608 (1999) (recognizing "inherent authority [of court] to administer cases on its docket"); cf. Shooltz v. Shooltz, 27 Va. App. 264, 271, 498 S.E.2d 437, 440 (1998) (recognizing inherent authority of court, in divorce case, to reopen record to take additional evidence).

The mere fact that the rules state "[t]he petition for appeal shall contain the questions presented" does not compel the conclusion the Commonwealth advances.  Rule 5A:12(c) (emphasis added).  In Johnson v. Commonwealth, 1 Va. App. 510, 511-13, 339 S.E.2d 919, 920-21 (1986), for example, we

- 5 -

interpreted the effect of the word "shall" as used in reference to a rule requiring mailing or delivery of a notice of appeal to the clerk of this Court.  Johnson involved the interplay between Rules 5A:3 and 5A:6.  Rule 5A:3, quoted more fully above, provides that the time for filing the notice of appeal is "mandatory," which we have interpreted in that context to mean "jurisdictional."  Johnson, 1 Va. App. at 512, 339 S.E.2d at 920.  Rule 5A:6 provides that "No appeal shall be allowed unless, within 30 days after entry of final judgment . . . counsel files with the clerk of the trial court a notice of appeal, and at the same time mails or delivers a copy of such notice to . . . the clerk of the Court of Appeals."  Rule 5A:6(a) (emphasis added).

We held in Johnson, despite use of the word "shall" in Rule 5A:6(a), that the only activity in that rule necessary to give this Court jurisdiction over the appeal was the filing of the notice of appeal with the clerk of the trial court and not the mailing or delivering of the notice to the clerk of this Court. Johnson, 1 Va. App. at 512-13, 339 S.E.2d at 920.  In so holding, we cautioned that

> we do not minimize the necessity of
> adherence to the mandate of the Rule by
> members of the bar.  We consider the
> requirement in the Rule to be significant
> and one that should not be ignored.
> Litigants and their attorneys must read and
> comply with the plain language contained
> therein.  Sanctions may be imposed unless an
> extension of time for complying with the

> Rule is granted for good cause shown in
> accordance with Rule 5A:3(b).

Id. at 513, 339 S.E.2d at 921.

The filing of a timely petition for appeal under Rule 5A:3(a), like the filing of a timely notice of appeal under that same rule, is jurisdictional. Nevertheless, the provisions of Rule 5A:12(c) stating what the petition "shall contain," like the provisions of Rule 5A:6(a) stating that "[n]o appeal shall be allowed" unless a copy of the notice of appeal is mailed or delivered to the clerk of the Court of Appeals, are not jurisdictional. They do not prevent us from exercising jurisdiction over assignments of error added to the petition, with leave of court, at a later date. In appellant's case, like in Johnson, "we do not minimize the necessity of adherence to the . . . Rule[s] by members of the bar." 1 Va. App. at 513, 339 S.E.2d at 921. A petitioner who fails to include one or more issues in his petition for appeal and subsequently asks the Court for leave to enlarge the petition acts at his peril because the Court is not compelled to grant such leave.[1] Nevertheless, the text of the Rule does not prevent this Court,

---

[1] We note appellant's contention that the ruling in Thomas v. Commonwealth, 263 Va. 216, 559 S.E.2d 652 (2002), changed the law applicable to his motion to change venue and that an appeal of the venue issue was not appropriate prior to the issuance of Thomas. Nevertheless, this claimed change in the law would not have prevented appellant from assigning error to the denial of his motion based on the same reasoning applied in Thomas. Cf. Commonwealth v. Jerman, 263 Va. 88, 92-94, 556 S.E.2d 754, 756-58 (2002). We mention this possibility only to make clear

in its discretion and pursuant to its inherent authority, see
Yarbrough, 258 Va. at 361, 519 S.E.2d at 608, from considering
such additional issues as long as the Court has acquired
jurisdiction over the appeal via timely filing of the original
petition for appeal.

## 2. Preservation in the Trial Court under Rule 5A:18

Rule 5A:18 provides that "[n]o ruling of the trial court
. . . will be considered as a basis for reversal unless the
objection was stated together with the grounds therefor at the
time of the ruling, except for good cause shown or to enable the
Court of Appeals to attain the ends of justice."  The purpose of
the rule is to avoid unnecessary appeals, reversals, and
mistrials by requiring litigants to inform the trial judge of
the action complained of so that the judge has the opportunity
to consider the issue intelligently and take timely corrective
action.  Robinson v. Commonwealth, 13 Va. App. 574, 576, 413
S.E.2d 885, 886 (1992).

Appellant contends he sufficiently preserved for appeal his
present challenge to the denial of his motion for a change of
venue by filing a pretrial motion to change venue and renewing
the motion after voir dire was complete.  We hold that
appellant's actions preserved his assignment of error only in

that we do not consider an actual or alleged change in the law a
prerequisite to the court's exercise of its discretion to allow
a petitioner to add assignments of error to a timely filed
petition.

- 8 -

part.  Appellant's challenge to the trial court's denial of his venue motion is three-fold.  He contends first that the evidence and the trial court's comments from the bench prevented a finding that the jury was impartial.  He argues next that, even if the jury was impartial, the court applied an improper standard in denying his motion because it considered only the fact that a jury was selected rather than "the ease with which the jury had been selected," as required under Thomas v. Commonwealth, 263 Va. 216, 559 S.E.2d 652 (2002).  Finally, he contends that under the Thomas standard, denial of the motion was error because the jury selection was "fraught with difficulty."

In the trial court, however, appellant did not contend the court applied an improper standard in denying the motion.  Appellant contends that his moving for a change of venue was sufficient to preserve the issue of the proper standard for review of such a motion for appeal.  Appellant contends that, like in Thomas, "[he] filed a pretrial motion seeking to change venue" and, "[f]ollowing voir dire, [he] again moved for a change of venue."  Thomas, 263 Va. at 229-30, 559 S.E.2d at 659.  Thus, argues appellant, this Court should consider whether the trial court applied the proper standard in ruling on his motion just as the Supreme Court did in Thomas.

We disagree.  Although appellant accurately repeats the procedural history set out in Thomas, the Supreme Court in

- 9 -

Thomas did not address a procedural bar issue. Id. at 229-33, 559 S.E.2d at 659-61. Thus, the opinion in Thomas does not stand for the proposition that the facts recited therein established proper preservation of the key issue for appeal.

Further, as the Supreme Court has held clearly in another context, the fact that the law in effect at the time of a trial sets out a particular method for proceeding does not prevent a defendant from arguing that method should be different[2] and does not excuse him from registering an objection in order to comply with Rule 5A:18. See, e.g., Commonwealth v. Jerman, 263 Va. 88, 92-94, 556 S.E.2d 754, 756-58 (2002) (holding fact that law at time of trial did not entitle defendant to instruction on abolition of parole in penalty phase of trial did not excuse defendant's failure to request parole instruction and, thus, that Rule 5A:18 barred consideration of issue in appeal that occurred after Court adopted rule that would have entitled defendant to such an instruction). "The perceived futility of an objection does not excuse a defendant's procedural default at trial." Id. at 94, 556 S.E.2d at 757.

Thus, we hold appellant's failure specifically to object to the standard he believes the trial court erroneously applied to his motion for a change of venue bars this aspect of his appeal.

_____

[2] For purposes of analyzing this issue, we merely assume without deciding that the holding in Thomas affected a change in the law.

Appellant's motion for a change of venue preserved only his general claim that he was unable to obtain a fair trial due to pretrial publicity and, thus, that the trial court abused its discretion in denying the motion.

3. Waiving Objection by Presenting Evidence of Same Character

The Commonwealth contends appellant waived his right to object to any bias resulting from pretrial publicity about his trip to Panama with his children when he introduced evidence at trial regarding media coverage of that trip. We disagree.

The principle cited by the Commonwealth provides "that 'where an accused unsuccessfully objects to evidence which he considers improper and then on his own behalf introduces evidence of the same character, he thereby waives his objection, and we cannot reverse for the alleged error.'" Hubbard v. Commonwealth, 243 Va. 1, 9, 413 S.E.2d 875, 879 (1992) (quoting Saunders v. Commonwealth, 211 Va. 399, 401, 177 S.E.2d 637, 638 (1970)) (emphasis added). We hold this principle does not apply in appellant's case because appellant did not object to the Commonwealth's admission of evidence at trial. Rather he objected to the empanelment of jurors who had learned of his trip to Panama through extra-judicial channels during the year prior to trial. Further, he objected not merely because pretrial media coverage reported that he went to Panama but also because that coverage characterized his trip as flight to avoid prosecution, an interpretation he denied as inaccurate. When

information about his trip to Panama was introduced at trial, it was presented to the jurors in the form of evidence, and appellant had an immediate opportunity to provide evidence rather than media speculation as to the reason for his trip. The context in which the evidence was admitted at trial was far different than the context in which jurors encountered the information in the media.  Thus, we hold that appellant's trial strategy to introduce evidence that he traveled to Panama did not constitute a waiver of his objection on the issue of juror impartiality.

B.

MERITS OF MOTION TO CHANGE VENUE

A ruling on a motion to change venue rests in the sound discretion of the trial court and will be upheld on appeal absent an abuse of that discretion.  See, e.g., Kasi v. Commonwealth, 256 Va. 407, 420, 508 S.E.2d 57, 64 (1998).  The law presumes a defendant will receive a fair trial in the jurisdiction in which the crimes occurred.  Id.  In order to overcome the presumption, a defendant must "demonstrat[e] that the feeling of prejudice on the part of the citizenry is widespread and is such that would 'be reasonably certain to prevent a fair trial.'"  Mueller v. Commonwealth, 244 Va. 386, 398, 422 S.E.2d 380, 388 (1992) (quoting Stockton v. Commonwealth, 227 Va. 124, 137, 314 S.E.2d 371, 380 (1984)).

In considering evidence of community prejudice based on pretrial publicity, widespread knowledge of the case alone is insufficient to overcome the presumption. Jurors need not be ignorant of the crime. In addition to the volume of publicity, factors identified as relevant in determining the impact of pretrial publicity on the defendant's ability to obtain a fair trial are whether the publicity is accurate, temperate, and non-inflammatory, and the timing of the publicity. Thus, publication of matters concerning the crime, the accused's prior criminal record, and even a confession of the accused, if factually accurate and non-inflammatory, is not improper and will not alone support a change of venue.

A potential juror who has knowledge of the case, even if such person has formed an opinion about the case, is entitled to sit on the jury if that opinion can be set aside. But the difficulties that the trial court encounters when finding jurors who, despite having advanced knowledge of the case and, perhaps, even preformed opinions, can impartially judge the case are relevant to deciding a motion to change venue. The ease with which an impartial jury can be selected is a critical element in determining whether the prejudice in the community stemming from pretrial publicity is so wide-spread that the defendant cannot get a fair trial in that venue. Roach v. Commonwealth, 251 Va. 324, 342, 468 S.E.2d 98, 109 (1996); Mueller, 244 Va. at 398, 422 S.E.2d at 388. Thus, generally it will be necessary for a trial court to undertake the task of attempting to seat the jury.

Thomas, 263 Va. at 230-31, 559 S.E.2d at 660 (citations omitted).

Appellant claims the pretrial media coverage was both extensive and inaccurate. He also contends the jury was not

impartial, as illustrated by both (a) the trial court's finding that the jury was aware of and could not ignore reports that he "fled" to Panama and (b) the Commonwealth's motion for a change of venue. Finally, he contends that even if the jury was impartial, denial of the motion to change venue was an abuse of discretion under the "ease of selection" standard.

We hold first that appellant's claims of media inaccuracy on brief did not involve true errors but rather involved (1) the omission of facts appellant claimed were important and (2) different ways of interpreting undisputed facts. The only claimed error appellant discussed in the portion of his brief challenging the denial of the venue motion was the media's characterization of his trip to Panama, based in part on quotes from Wise County officials, as appellant's "fleeing" the jurisdiction and "hiding out" in Panama. Appellant argued the fact that he obtained round-trip airline tickets for himself and his children in their true names and that they lived openly in a hotel they had visited previously on a church trip belied the characterization of the media and the quoted Wise County officials that he fled the country to avoid prosecution. He contended his passing of a polygraph examination was not reported by the newspapers and that he left Wise County after passing the polygraph to avoid friction over a visitation dispute with the victim's family. However, other evidence established that when appellant left the country, he falsely

told his employer and officials at his children's schools that he was taking the family to a funeral in Pennsylvania and that, when he spoke to his parents about three weeks later, he did not reveal his location to them. Further, at the time he left Wise County, a capias for his arrest remained outstanding as a result of his failure to appear over two months earlier for a hearing related to the settlement of his wife's estate. Thus, whether appellant was "hiding out" in Panama and "fled" to avoid prosecution were facts in dispute. The media's characterization of appellant's travel as "flight" did not constitute false or inaccurate reporting.

Appellant contends on brief the trial court "stat[ed] its own belief that the jury knew about Panama and could not ignore it." Appellant misinterprets the trial court's statements. Appellant's reference to the statement implies the court found the jurors could not ignore the fact that appellant went to Panama. What the trial court actually said, however, was that at least some of the jurors probably knew appellant went to Panama and that the trial court itself could not ignore the fact that some of the jurors probably knew of the trip. The trial court never found that the jurors both were aware of and could not ignore the fact of appellant's trip to Panama. Further, all jurors on the venire panel who said they had heard or read something about appellant or the crime prior to trial also said they could ignore what they had heard and decide the case based

on the evidence presented at trial. The trial court's denial of the motion for a change of venue supports a conclusion that it believed those jurors who knew about the trip to Panama could nevertheless decide the case based on the evidence admitted at trial.

Appellant's argument that the Commonwealth believed a change of venue was necessary based on juror partiality also is belied by the record. The Commonwealth joined in appellant's motion for a change of venue only after the venire panel had been selected and the trial court intimated it would allow appellant to offer evidence that he passed a polygraph examination before going to Panama in order to combat appellant's fear of jury bias based on media coverage of his trip. The Commonwealth expressed concern that the trial court's ruling on the admissibility of the polygraph evidence would amount to a ruling that the jury was not impartial. The Commonwealth never indicated that it held such a belief, and, for the reasons discussed above, the trial court's ruling on the admissibility of the evidence did not constitute a finding that the jury was not impartial.

Lastly, we hold that an analysis of the level of ease with which the jury was selected does not compel a finding that the court's denial of the venue motion was an abuse of discretion. Jury selection, including on-the-record review of the jury questionnaires by court and counsel, began at 4:00 p.m. on

October 2, 2000, and selection of the venire was completed by mid-afternoon on October 5, 2000, with opening statements beginning on October 6, 2000. Thus, selection of the venire took no more than three days.

The selection process began with the court's and the parties' examination of questionnaires from 87 potential jurors. Out of the original pool of 87, the trial court dismissed 13 for reasons related at least in part to bias and 8 for unrelated reasons. Of the remaining pool of 66, the court conducted detailed questioning of 42, dismissing 5 for bias and 12 for unrelated or unarticulated reasons. Thus, out of 87 potential venire people, the court released 18 due at least in part to bias and 20 for unrelated reasons before selecting a venire of 25. At that time, a pool of 24 potential jurors remained who had survived review of their questionnaires but, due to lack of need, had not undergone individual voir dire. See, e.g., Kasi, 256 Va. at 420-21, 508 S.E.2d at 64-65 (where "virtually all the prospective jurors indicated they had heard or read about the case" but the court "seated a panel of 24 jurors, following detailed questioning of only 58 persons," jury was selected with "relative ease" and "[d]efendant did not overcome the presumption that he could receive a fair trial"); Coleman v. Commonwealth, 226 Va. 31, 45, 307 S.E.2d 864, 871 (1983) (upholding denial of motion for change of venue where court struck 15 out of 42 jurors based on their having formed an

opinion or failing to understand the presumption of innocence); Brown v. Commonwealth, 28 Va. App. 315, 339-40, 405 S.E.2d 399, 409-10 (1998) (upholding denial of motion for change of venue where 22 out of 60 jurors were discharged because they had formed an opinion based on pretrial publicity and 14 were discharged for unrelated reasons).

The fact that five jurors had to be excused and replacements selected on the morning of October 5, 2000, after the trial court and the parties believed they had completed selection of a venire panel of 25 members, does not require a different result. Of those additional 5 released, the evidence established only that one of the replacements was necessitated by concerns over partiality. Further, although the court previously had released the remaining jurors and had to recall them, it still had a group of 30 from which to choose (reduced to 24 after the court questioned 6 more, released 1, and added the remaining 5 to the venire). The entire process was accomplished in 3 days and did not involve "unusual or unexpected difficulty in impaneling a jury free from bias." Coleman, 226 Va. at 45-46, 307 S.E.2d at 872.

Although approximately 80% of the 42 jurors who underwent individual voir dire said they had heard or read something about

the case prior to trial,[3] all of those jurors who remained on the

panel said they would be able to ignore what they had heard and

to decide the case based on the evidence presented at trial.

Under these circumstances, we hold the trial court did not abuse

its discretion in denying the motion for a change of venue.

### III.

### JUROR MISCONDUCT AND MISTRIAL MOTION

### A.

### BACKGROUND

Fifteen jurors, including three alternates, were selected.

One of those jurors, whose surname was Gibson, engaged in

misconduct both inside and outside the jury box.  On the eighth

day of trial, before court had reconvened, Gibson went to the

Commonwealth's Attorney's office to report an error in one of

the Commonwealth's exhibits, which said that appellant had found

his wife's body when other testimony established he was

receiving medical treatment at the hospital when his wife's body

was found.  The Commonwealth's Attorney immediately reported the

incident to the court, and appellant moved for a mistrial

because the juror ignored instructions from the court not to

conduct an independent investigation.  The court denied the

_____

[3] The trial court did not permit questioning regarding
precisely what the prospective jurors had heard about the case.
Appellant did not specifically assign error to this ruling.

mistrial motion and again cautioned the entire jury not to engage in such conduct.

On the sixteenth day of trial, appellant moved for a mistrial based on what he described as Juror Gibson's "distractions, inattentiveness, and what I would suggest amounts to juror misconduct." Appellant's counsel noted that Gibson appeared to be ignoring testifying witnesses and talking to two of his fellow jurors during the presentation of the evidence. Counsel argued, "I don't know what's going on in the jury room, but if . . . he's doing that publicly in the courtroom, my common sense tells me that he's engaging in similar conduct [in the jury room]." The court and the Commonwealth confirmed they had observed some of the behavior about which appellant complained.

The court then questioned Gibson and the two jurors to whom he was seen speaking in the jury box. When the court questioned Juror Gibson under oath, he admitted commenting about the exhibits to Jurors Russell and Mullins while in the jury box and said he often did not watch the testifying witness because he was "looking for audience reaction and . . . lawyer reaction" to the testimony.

The trial court released Juror Gibson from service, informed the remaining jurors of his release, asked which jurors had heard Gibson comment about the case "in the Jury's chambers," and questioned individually the additional eight

jurors who said they had.  Appellant agreed that questioning of the remaining jurors was unnecessary.  After questioning a total of ten jurors with whom Gibson had communicated about the case, each of whom indicated that she still had an open mind and could render an impartial verdict, the trial court denied appellant's mistrial motion.  It then instructed the jury to ignore the comments Juror Gibson had made, both in the jury box and in the jury room during breaks, noting that "[s]ome of his assertions were not correct."

Trial continued with the remaining jurors, who convicted appellant for first degree murder, arson and petit larceny.

Appellant filed a motion to set aside the verdict in which he again challenged the trial court's denial of the motion for mistrial based on juror misconduct.  The trial court denied the motion to set aside and imposed sentence.

B.

ANALYSIS

"[T]he mere fact of juror misconduct does not automatically entitle either litigant to a mistrial.  Instead, the trial court, in the exercise of sound discretion, must determine whether such misconduct probably resulted in prejudice.  And the burden of establishing that probability is upon the party moving for a mistrial."  Robertson v. Metropolitan Washington Airport Auth., 249 Va. 72, 76, 452 S.E.2d 845, 847 (1995) (citation omitted).  "Unless the record shows the contrary, it is to be

presumed that the jury followed an explicit cautionary instruction promptly given."  LeVasseur v. Commonwealth, 225 Va. 564, 589, 304 S.E.2d 644, 657 (1983) (applying principle in context of improper question or conduct of counsel); see Green v. Commonwealth, 26 Va. App. 394, 402, 494 S.E.2d 888, 892 (1998) (applying principle in context of mid-trial challenge to juror impartiality).

Whether an irregularity has prejudiced a party and whether a juror remains fair and impartial are questions of fact to be resolved by the trial court and are entitled to deference on appeal.  See Watkins v. Commonwealth, 229 Va. 469, 480, 331 S.E.2d 422, 431 (1985); Lewis v. Commonwealth, 211 Va. 80, 82-83, 175 S.E.3d 236, 238 (1970).  "The denial of a motion for mistrial will not be overruled unless there exists a manifest probability that the denial of a mistrial was prejudicial." Harward v. Commonwealth, 5 Va. App. 468, 478, 364 S.E.2d 511, 516 (1988).

1.  Misconduct Mooted by Gibson's Discharge from the Jury

Appellant complains on brief about Gibson's attempt to communicate with the Commonwealth's Attorney by visiting his office and sending him a note in the courtroom during trial. However, no evidence established that Gibson was the author of the note addressed to the Commonwealth's Attorney.  Further, even if Gibson was the author, Gibson was discharged from the jury, see United States v. Copeland, 51 F.3d 611, 613-14 (6th

Cir. 1995) (where juror whose partiality was questioned was removed prior to deliberations, holding "the defendant suffered no prejudice"), and no evidence even intimated that the remaining jurors were aware of Gibson's efforts or were in any way prejudiced by them.

## 2. Distraction Due to Misconduct Inside the Jury Box

Appellant contends Gibson annoyed the other jurors and generally distracted them from hearing the evidence while in the jury box. To the extent appellant preserved this argument for appeal, we hold the trial court did not abuse its discretion in denying the motion for mistrial on that ground.

When appellant moved for a mistrial and included as a basis the ground that Gibson was creating a distraction in the jury box, he stated that Gibson appeared to be ignoring testifying witnesses and talking to two of his fellow jurors during the presentation of evidence. He did not specifically contend that Gibson's talking to those two jurors prevented them or any of the other jurors from hearing or absorbing the evidence being offered. The trial court then questioned Jurors Russell and M. Mullins, the two jurors to whom Gibson had been speaking. Those jurors testified that they did not pay attention to what Gibson had said and asked him to be quiet. Both also testified that they remained open-minded and impartial about the case. Although the trial court gave counsel an opportunity to suggest questions that should be posed to the jurors, appellant did not

ask the court to inquire specifically about whether Gibson's talking to them in the jury box prevented them from hearing or absorbing any of the evidence being offered. Appellant also did not ask the court to question any of the other jurors about whether Gibson's conversations in the jury box prevented them from hearing or absorbing the evidence.[4]

After the court questioned Jurors Russell and M. Mullins individually, the following exchange took place:

> [APPELLANT'S COUNSEL]: I think that the comments in the jury room are the issue and we don't have such a problem with Ms. Russell or Ms. Mullins who seem to be pretty solid, straight-up open-minded jurors still.
>
> THE COURT: Yeah.
>
> [APPELLANT'S COUNSEL]: Although they may have been distracted by this, which is kind of a problem, but . . .
>
> THE COURT: Not much, but a possibility.
>
> [APPELLANT'S COUNSEL]: But I think the . . . serious thing is the kind of unknown comments he's made in the jury room . . . .

Thus, appellant's argument focused on the activity that occurred outside the jury box and inside the jury room. The trial court, which itself had been in a position to observe Gibson's activity in the jury box, described the distractions as "not much" and

---

[4] Juror Hylton later volunteered that Gibson's behavior in the jury box had been irritating, but she did not indicate it had prevented her from hearing or absorbing the evidence. Further, after hearing her testimony, appellant did not ask the court to inquire further of her or any of the other jurors.

found merely "a possibility" rather than a probability that Gibson's activity in the jury box prevented Jurors Russell and M. Mullins from hearing or absorbing the evidence. Appellant did not dispute this conclusion until after the jury had returned its verdict and been discharged. We hold the evidence, or lack thereof, supported the trial court's conclusion and, thus, that the trial court's denial of the mistrial motion on this ground was not an abuse of discretion.

### 3. Specific Incidents of Misconduct

Appellant also challenges several of Gibson's statements based on their content and argues generally that these comments show the jury engaged in premature deliberations.

### a. Indirect Third-Party Contact and Newspaper Reports

Appellant's most significant challenge is to Gibson's statement in the jury room that his wife allegedly told him about a newspaper article indicating the defense had moved for a mistrial because the jurors were taking notes. He asserts this constituted an unauthorized communication between a third party and a juror, that the content of the communication was likely to prejudice jurors against him and that, under these circumstances, he was entitled to a presumption of prejudice.

We addressed third-party communications in Scott v. Commonwealth, 11 Va. App. 516, 518-19, 399 S.E.2d 648, 649 (1990) (en banc), in which the jury orientation officer made improper remarks to potential jury members, at least one of whom

ultimately served on Scott's jury, that juries in that jurisdiction were known for their leniency and were looked down upon by neighboring jurisdictions as a result.  In awarding Scott a new trial, we recognized the following test:

> "In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.  The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant."

Id. at 520, 399 S.E.2d at 650 (quoting Remmer v. United States, 347 U.S. 227, 229, 74 S. Ct. 450, 451, 98 L. Ed. 654 (1954)) (emphasis omitted).  We held the statements were "harmful" rather than "innocuous," thereby shifting the burden to the Commonwealth to prove the contact was harmless.  Id. at 520-21, 399 S.E.2d at 650-51.  We held "[t]he mere fact that three of the twelve jurors said they were not influenced in their deliberations [was] insufficient, standing alone and in the absence of evidence that they were the only jurors who heard the remarks, to establish harmless error."  Id. at 521, 399 S.E.2d at 651.

In appellant's case, we hold the challenged remarks were significantly less inflammatory than the remarks at issue in

<u>Scott</u>.  The information Juror Gibson obtained from his wife pertained to a newspaper article allegedly indicating that the defense had moved for a mistrial because the jurors were taking notes.  We assume without deciding that these remarks were sufficient to shift the burden to the Commonwealth, but we hold the evidence supported the trial court's implicit finding that the remarks were harmless.

First, the evidence specifically established that only ten of the jurors heard Gibson say anything about the case and that only five of those jurors, K. Mullins, Beason, Harris, Gentry and Kobylareyk, heard Gibson reference any newspaper articles.  Jurors Harris and Kobylareyk said they stopped Gibson before he was able to tell them what the article was about.  Juror Gentry said she did not specifically recall what Gibson said about the article.  Only Jurors Beason and K. Mullins knew or remembered that the article allegedly dealt with a defense motion for a mistrial, and only K. Mullins said the motion allegedly stemmed from the jurors' taking notes.

Second, under careful examination by the court, all ten jurors who had heard Gibson say anything about the case confirmed that they had not been influenced by Gibson's remarks and remained able to render an impartial verdict.  The court specifically told Juror K. Mullins, the only juror who heard and remembered Gibson's claim that the mistrial motion supposedly was prompted by the jurors' taking notes, that Gibson's

statement was untrue. Juror K. Mullins responded, "you could tell [Gibson] was kind of a blow bag."

Third, after discharging Gibson and consulting with counsel, the trial court expressly instructed the entire jury to ignore Juror Gibson's comments in the jury box and jury room, noting that "[s]ome of his assertions were not correct."

Under these circumstances, we hold the evidence supports the trial court's implicit finding that any indirect third party contact the jurors had with Gibson's wife was harmless. Thus, the trial court did not abuse its discretion in denying appellant's mistrial motion on this ground.

### b. Gibson's Other Comments

Appellant also challenges specific statements Gibson made to Jurors Russell and Harris about the evidence. Appellant complains of a comment Gibson made to Russell about "Dr. Nida's report" but does not articulate how that comment prejudiced him. He also complains of Gibson's speculating to Harris that the victim may have been raped and criticizing the testimony of a witness who opined on the flammability of certain materials. Again, however, he has not articulated how these statements prejudiced him. To the extent these comments show Gibson attempted to engage in premature deliberations, all jurors who heard Gibson make any comments on the case or the evidence said they refused his efforts to engage them in conversation and attempted to ignore him. As discussed above, these jurors also

testified that his statements did not cause them to form an opinion regarding the defendant's guilt or innocence and that they remained able to render an impartial verdict.

Lastly, appellant complains about sexually inappropriate comments Juror Beason reported Gibson made to her and other members of the jury in the jury room. However, appellant made no contemporaneous mention of this behavior as forming part of the basis for his mistrial motion and did not ask the court to inquire of jurors other than Beason as to how Gibson's behavior in the jury room may have impacted their ability to remain fair and impartial. Assuming this aspect of the assignment of error is preserved for appeal, we see no basis for inferring the probability of prejudice necessary to support the declaration of a mistrial.

Thus, we conclude appellant did not establish a probability of prejudice from Gibson's conduct and hold the trial court did not abuse its discretion in denying appellant's motion for mistrial.

### IV.

### PARTICIPATION OF PRIVATE PROSECUTOR

Prior to trial, the Commonwealth's Attorney moved the court to allow a private prosecutor, Guy M. Harbert, III, retained by the family of the victim, to participate in appellant's prosecution. Over appellant's objection, the trial court allowed Harbert to participate.

On appeal, appellant contends the use of private prosecutors should be abolished.  In the alternative, he contends the private prosecutor here had two conflicts of interest that should have disqualified him from serving and that the level of his participation exceeded that allowed by Cantrell v. Commonwealth, 229 Va. 387, 329 S.E.2d 22 (1985).

Whether to allow a private prosecutor to participate in a particular case "lies within the discretion and continuing control of the trial court."  Id. at 392, 329 S.E.2d at 26. Factual findings related to that decision, like any factual findings made by a trial court, are binding on appeal unless plainly wrong or without evidence to support them.  See Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987).

"A conflict of interest on the part of the prosecution in itself constitutes a denial of a defendant's due process rights under art. I, § 11 of the Constitution of Virginia, and cannot be held harmless error."  Cantrell, 229 Va. at 394, 329 S.E.2d at 26-27.  The Supreme Court has recognized that "[a] lawyer who represents the victim of a crime, or the victim's family, in a civil case arising out of the occurrence which gives rise to a criminal prosecution, for which he is hired as a special prosecutor, necessarily incurs a conflict of interest.  He cannot serve two masters."  Id. at 393, 329 S.E.2d at 26.

We acknowledge appellant's argument that a conflict appears to exist based on the fact that a private citizen rather than the government pays a private prosecutor's fees. Nevertheless, this conflict is one not considered a disabling conflict at common law, as indicated by the very practice of allowing private prosecutors. Id. at 392, 329 S.E.2d at 25-26. Whatever wisdom we might see in discontinuing the practice, id. at 392, 329 S.E.2d at 25 (recognizing "[t]he policy arguments advanced by the defendant for a total prohibition of privately employed prosecutors may have a sound basis in considerations of public policy"), it still exists at common law, and as the Supreme Court recognized in Cantrell, any decision to further limit or abrogate the practice must be made by the General Assembly rather than the courts, id. Thus, we are left to consider whether any cognizable conflicts of interest existed that prevented appellant from having a fair trial and whether the level of Harbert's participation exceeded the bounds of Cantrell.

Appellant contends that Harbert had a conflict of interest because he owed a duty of confidentiality to the Ringleys, the private citizens paying his fee, that conflicted with his duty as a prosecutor to turn over exculpatory evidence. For the same reasons we are not at liberty to prevent the service of private prosecutors, we must conclude that such a conflict exists neither at law nor under the specific facts of this case.

Because the common law permits the employment of private prosecutors, the mere fact that a private citizen, most likely a member of a victim's family or someone with a similarly strong interest in the outcome of a case, pays the private prosecutor's fees does not support the conclusion that the private citizen is a client of the private prosecutor or that the private prosecutor owes any duty of confidentiality to the person who pays his fee.  The Supreme Court recognized implicitly in Cantrell that no attorney-client relationship arises between a private prosecutor and the person who pays the fees incurred for that purpose.  Only if the private prosecutor directly represents the person paying his fee in some other capacity does such a conflict arise.  Id. at 393, 329 S.E.2d at 26 (noting private prosecutor represented family of victim in a child custody suit against the defendant).

Here, the evidence supports the trial court's implicit finding that Harbert had no legal relationship with the Ringleys that created a duty of confidentiality or other conflict of interest.  The trial court accepted Harbert's statement that his retention letter indicated his "agreement with [the Ringleys] . . . to represent the Commonwealth" in return for the Ringleys' "paying [Harbert's] fee."  (Emphasis added).  Harbert stated his belief that he did not represent the Ringleys, that "there has been nothing the Ringleys have told me that I am holding in confidence" and "that everything that constituted [Brady]

material has been turned over to the defense in this case."
Harbert, an insurance defense lawyer, testified the relationship
was much like the one that exists when an insurance company pays
him to represent an insured involved in an auto accident.  The
trial court found these representations credible, and they
support the conclusion that Harbert's relationship with the
Ringleys was not a disqualifying conflict of interest.

Harbert's representations also support the trial court's
implicit conclusion that neither Harbert nor his law firm had a
contemporary, or even recent, attorney-client relationship with
CIGNA, parent of LINA, the company liable on the victim's life
insurance policy.  In light of Harbert's representations that he
had performed a conflict-of-interest check and that his firm had
last represented CIGNA ten years previously, the court was
entitled to credit his representations over a Martindale-Hubbell
entry that listed CIGNA as one of the firm's representative
clients.

The evidence also supports the trial court's conclusion
that Harbert's participation did not exceed the bounds of
Cantrell.  Although the Supreme Court disposed of Cantrell on
the conflict of interest issue, it described the role of the
private prosecutor in assisting the prosecution:

> His role is more limited than that of the
> public prosecutor.  By the weight of
> authority, he may not initiate a prosecution
> or appear before the grand jury; he may
> appear only by leave of the trial court;

> he may participate only with the express
> consent of the public prosecutor; he may
> make a closing jury argument only in the
> court's discretion; and he may take no part
> in a decision to engage in plea bargaining,
> deciding the terms of a plea bargain, or a
> decision to accept a plea of guilty to a
> lesser crime or to enter a nolle prosequi.

Id. at 393, 329 S.E.2d at 26 (citations omitted). However, despite these limitations, as long as "the public prosecutor . . . remain[s] in continuous control of the case," "there is no arbitrary limitation as to the proportion of work which may be done by a private prosecutor." Id. (emphasis added).

Here, appellant makes no claim that the private prosecutor engaged in prohibited activities such as initiating the prosecution or plea bargaining. Rather, he contends that Harbert's "participation dominate[d] the case" and that he impermissibly controlled the arson prosecution, the means by which the Commonwealth proved the murder charge, as well.

The Commonwealth represents Harbert conducted direct examination of just over 20% of the Commonwealth's witnesses in its case-in-chief and cross-examined 20% of appellant's witnesses during appellant's case-in-chief and surrebuttal. In the Commonwealth's rebuttal, Harbert did not examine any of the Commonwealth's five witnesses. Appellant does not expressly challenge the Commonwealth's calculations. In light of these calculations, we hold the Commonwealth's utilizing Harbert's admitted arson expertise by focusing his participation

predominantly on the examination of witnesses related to the fire did not violate Cantrell. Permitting private prosecutors to handle only innocuous witnesses and evidentiary matters would effectively abrogate the common-law principle that still permits their appointment. As set out above, abrogation is a task for the General Assembly rather than the courts. In the absence of such abrogation, we hold Harbert's participation in appellant's prosecution did not violate the principles in Cantrell.

Thus, we affirm both the trial court's decision to allow Harbert's participation and the level to which it permitted Harbert to participate.

V.

ADMISSIBILITY OF PAWN SHOP RECORDS

Police recovered three rings, one of which was a diamond anniversary band, from a pawn shop in Bristol, Tennessee. The Commonwealth sought to prove the rings had belonged to the victim and that appellant was the person who had sold them to the pawn shop.

The Commonwealth offered evidence from the Riners' babysitter/housekeeper and one of the victim's co-workers that the victim "always wore" the diamond anniversary band and that she had that ring on at work on the day of the fire.

The Commonwealth offered testimony from Cheryl Brown, the manager of the pawn shop from which the rings were recovered. Brown identified Commonwealth's Exhibit 97-A as pawn shop

records showing entries in both a journal and spiral notebook kept in the ordinary course of business. The spiral notebook indicated that, on March 11, 1999, Charles Douglas Riner of 159 Bear Drive, Bluff City, Tennessee, sold the pawn shop "assorted merchandise," for which he received $230. The corresponding entry in the journal, assigned the number 1054, contained a more detailed description of the merchandise, including "three rings" and "four pocket watches." A tag bearing the number 1054 was then placed on each item and would have remained in place until each item was sold.

Appellant objected to admission of the logs, arguing the Commonwealth failed to subpoena the entrant and the evidence failed to prove the entrant was unavailable. The Commonwealth represented that the entrant was "elderly[,] . . . eighty (80) some years old and is not able [to come to court]." The trial court then observed, "You've got to tell me those things; I'm not a mind reader. . . . I'm going to have to have some evidence here, so I can make a ruling, but . . . inconvenience and unavailability, that's an issue, so I['ve] got to know, is this entrant unavailable or not?"

Witness Brown then testified that the employee who made the entries was seventy-nine years old, was "off on sick leave" because she had "suffered a back injury" and "is unable to get up right now." Appellant renewed his objection to admission of the records based on lack of proof of unavailability, arguing "I

don't know whether she's in a wheelchair or not." The trial court observed, "I don't know whether she's in the hospital or is available or not." The parties then discussed briefly a second objection to the records, one not at issue in this appeal. After that discussion, the court ruled, "I'm going to allow [the records] and overrule your motion and find [them] to be an exception to the hearsay rule under the Shopbook Rule, the business records kept."

When appellant took the stand, he admitted he sold a bag of what he called "scrap" jewelry to the pawn shop, but he denied having seen the rings he sold that were identified as the victim's, either at the time he sold them or at any other time. Appellant claimed he found the bag of jewelry in the safe in the basement of the house he had shared with the victim, opened it enough to see just a few of the items, and "assumed" it contained rings and other jewelry he had collected since he was a teenager but would no longer wear because they were out of style. He testified that when he arrived at the pawn shop, one of the store's employees took the bag to a table behind the counter and examined each item individually, outside appellant's view, while appellant looked around the store.

A. WAIVER OF OBJECTION BY PRESENTING EVIDENCE OF SAME CHARACTER

The Commonwealth contends appellant waived his right to object to the introduction of the pawn shop records on hearsay grounds because he presented evidence of the same character when

he took the stand and admitted that he sold a bag of jewelry to the pawn shop.  We disagree.

"Generally, when a party unsuccessfully objects to evidence that he considers improper and then introduces on his own behalf evidence of the same character, he waives his earlier objection to the admission of that evidence."  Combs v. Norfolk & Western Ry., 256 Va. 490, 499, 507 S.E.2d 355, 360 (1998) (holding plaintiff waived objection where plaintiff objected to defendant's use of work bench as demonstrative exhibit because it differed from work bench plaintiff was using on day of injury and plaintiff subsequently "used the same exhibit[] in presenting demonstrative evidence on his own behalf").  However,

> [a]n objection to previously introduced testimony is not waived by "the mere cross-examination of a witness or the introduction of rebuttal evidence, either or both."  A waiver does not result until the party objecting to the introduction of evidence actually introduces, on his own behalf, evidence that is similar to that to which the objection applies.

McGill v. Commonwealth, 10 Va. App. 237, 244, 391 S.E.2d 597, 691 (1990) (citation omitted) (quoting Snead v. Commonwealth, 138 Va. 787, 801, 121 S.E. 82, 86 (1924)); see also Hubbard, 243 Va. at 9-10, 413 S.E.2d at 879 (finding waiver where party objected to opponent's use of "reconstructed opinion evidence to prove speed" and then offered what the Court found was her own "reconstructed opinion evidence to prove speed").

In McGill, which involved a charge of murdering a prostitute, the Commonwealth introduced evidence that the accused had assaulted a different prostitute earlier in the same evening during which the murder was committed. McGill, 10 Va. App. at 243-44, 391 S.E.2d at 601. The accused objected to the admission of evidence of other crimes to prove the crime charged. Id. at 244, 391 S.E.2d at 601. When the accused took the stand, he "described his version of this assault." Id. We rejected the Commonwealth's claim that the accused's testimony constituted the introduction of evidence of the same character, holding that the accused "only attempted to rebut the Commonwealth's evidence by describing his version of how the other assault occurred and did not attempt to introduce similar evidence on his own behalf." Id.; see also Brooks v. Bankson, 248 Va. 197, 207, 445 S.E.2d 473, 479 (1994) (holding that where "the Sellers made known to the trial court their objections to the court's interpretation of the contract, and to its evidentiary ruling predicated on that interpretation," "the Sellers were entitled to present evidence of their own on the same subject" "[i]n order to meet the Buyers' evidence of the condition of the crawl space introduced pursuant to these rulings").

Here, appellant was entitled to explain the challenged hearsay evidence that tended to indicate he had sold various items of jewelry to the pawn shop without waiving his objection

to the admission of that hearsay evidence. Appellant did not use the pawn shop's records or any similar hearsay evidence with which to do so. Further, when appellant testified, he did not identify any of the rings to which the pawn shop records had connected him and said he merely glanced at the contents of the bag before selling them. Thus, appellant did not waive his right to object to the Commonwealth's hearsay evidence by introducing evidence of the same character.

B. BUSINESS RECORDS: PROOF OF ENTRANT'S UNAVAILABILITY

The business records exception to the hearsay rule requires proof of "actual" or "commercial" unavailability. Tickel v. Commonwealth, 11 Va. App. 558, 565, 400 S.E.2d 534, 538 (1991). It is well established that reasons for actual unavailability include illness. Id. The proponent of the hearsay evidence need not attempt to subpoena the witness as long as it provides a reasonable explanation for why a subpoena was not issued. McDonnough v. Commonwealth, 25 Va. App. 120, 129, 486 S.E.2d 570, 574 (1997). Finally, "'the sufficiency of proof to establish the unavailability of a witness is largely within the discretion of the trial [judge], and, in the absence of a showing that such discretion has been abused, will not be interfered with on appeal.'" Bennett v. Commonwealth, 33 Va. App. 335, 348, 533 S.E.2d 22, 29 (2000) (quoting Burton v. Oldfield, 195 Va. 544, 550, 79 S.E.2d 660, 665 (1954)).

Here, evidence in the record supports a finding that the employee who made the entry in the pawn shop's records was unavailable because she was out of work with a back injury that left her "unable to get up" at the time of trial. Notwithstanding the trial court's statement, "I don't know whether she's . . . available or not," made during counsel's argument prior to the court's ruling, the court later ruled that the evidence was admissible under "the Shopbook Rule, the business records kept [rule]." Although the trial court gave no contemporaneous explanation for its ruling, established precedent provides that,

> [a]bsent clear evidence to the contrary in the record, the judgment of a trial court comes to us on appeal with a presumption that the law was correctly applied to the facts. . . . [W]e will not fix upon isolated statements of the trial judge taken out of the full context in which they were made, and use them as a predicate for holding the law has been misapplied.

Yarborough v. Commonwealth, 217 Va. 971, 978, 234 S.E.2d 286, 291 (1977) (emphasis added); see also Bassett v. Commonwealth, 13 Va. App. 580, 583-84, 414 S.E.2d 419, 421 (1992) (applying Yarborough to hold that "the trial court's remark is not, in and of itself, 'the full context' simply because it represents the only point at which the court [expressly] addressed the [factual] issue [in dispute]"). The trial court clearly stated during discussion on the motion that it needed to know whether the "entrant [was] unavailable or not" in order to rule on the

motion.  Thus, the trial court's statement, during earlier argument, that it did not know whether the entrant was "in the hospital or is available or not," does not constitute clear evidence that the court improperly applied the law.  To the extent the trial court's earlier statement could be construed as a preliminary finding that the Commonwealth failed to prove the entrant's unavailability, we must presume the trial court's ultimate ruling constituted its reversal of this preliminary finding.  Because the evidence supports a finding that the entrant was unavailable due to illness, we affirm the trial court's admission of the evidence.

VI.

For these reasons, we hold the trial court did not erroneously (1) deny the motion to change venue; (2) deny appellant's motion for mistrial based on juror misconduct that resulted in dismissal of that juror; (3) allow a private prosecutor to participate in the trial; or (4) admit the business records of a pawn shop as an exception to the hearsay rule without proof that the entrant was unavailable.  Thus, we affirm the challenged convictions.

Affirmed.